534 P.2d 1102

**DALE'S SERVICE COMPANY, INC., an Idaho Corporation, Plaintiff and Counter-Defendant, and Respondent,**

v.

**Garlin J. JONES and Emmett Todd, dba T & J Contractors, Defendant and Counter-Claimant, Third-Party Plaintiff, and Appellant,**

and

**O.K. CAR WASH, INC., a Nevada Corporation, Third-Party Defendant and Respondent.**

No. 11376.

Supreme Court of Idaho.

May 6, 1975.

James Christensen, Coughlan, Imhoff, Christensen & Lynch, Boise, for appellant.

R. B. Rock, Moffatt, Thomas, Barrett & Blanton, Boise, for Dale's Service Co., Inc., respondent.

Phillip M. Barber, Elam, Burke, Jeppesen, Evans & Boyd, Boise, for O.K. Car Wash, Inc.

McQUADE, Chief Justice.

O. K. Car Wash, Inc., third party defendant and respondent (hereinafter O. K. or landowner) engaged the services of Dale's Service Company, Inc., plaintiff, counter-defendant and respondent (hereinafter Dale or general contractor) for the construction of a car wash facility, called the O. K. Car Wash, on a site which O. K. owned at the southwest corner of Overland and Orchard Streets in Boise. A contract was executed between O. K. and Dale on April 19, 1971, under which Dale was to build this facility for O. K. at the "turn key" price of $59,500. Dale was responsible for the construction of the sidewalks, curbs and gutters as called for in the plot plan. It was also responsible for the installation of the foundations, footings, concrete work, electrical work, sewer, sprinkler system, fill material and paving in accordance with the plans and specifications submitted to it by O. K. Dale retained the services of Garlin J. Jones and Emmett Todd, doing business as T & J Contractors, defendant, counter-claimant, third party plaintiff and appellant (hereinafter T & J or subcontractor) as a subcontractor to furnish and compact earth fill at the car wash site for $4,500. An agreement was entered into between Dale and T & J dated April 22, 1971 on a standard contract form provided by the American Institute of Architects for agreements between subcontractors and contractors. The dispute before this Court concerns claims and counterclaims arising out of this purported subcontractual agreement between Dale and T & J.

T & J commenced to furnish the fill material on or about April 26, 1971. During construction some changes were made which varied from the original plans and specifications. A retaining wall was deleted from the south side of the property, additional fill was provided for the south end of the lot, an approach on the south side of the property was widened, a flow line was modified, some planters were made smaller, and some trash and stumps were moved from a basement which was then backfilled. In addition, apparently due to Dale's inadvertent error, the car wash floor was built about five inches higher than required by the plans. T & J were paid an additional $600 by Dale for the work that was necessitated by these changes.

Hobson, president of Dale, testified that on several occasions he spoke to T & J about their work, informing them that they were not bringing adequate fill to the job site nor were they leveling off the fill on the site as required under the subcontract. Although Hobson testified that T & J's performance improved after the talks, he finally became dissatisfied with their work and sent them a letter of termination on or about June 25, 1971. After receiving the

termination letter, T & J ceased to furnish any fill or otherwise perform any further work at the O. K. Car Wash site. At the time of termination, T & J claimed they had furnished 10,720 yards of fill. Dale found it necessary to hire Boise Paving to bring in additional fill, and to level this fill off so that paving on the site could be completed.

Dale filed a complaint against T & J claiming in Count I that the latter breached the subcontract of April 22, 1971 by failing to complete and perform their contractual obligations in a satisfactory workmanlike manner, and alleging in Count II that T & J were guilty of fraud in their dealings with it. Dale asked for damages to compensate it for the additional expenses it incurred to complete the job it claimed T & J promised to do, and for punitive damages resulting from the alleged fraud. In their answer, T & J contended that there was no meeting of the minds of the parties as to the April 22nd agreement, therefore rendering it null and void; and that Dale had failed to state the circumstances constituting the alleged fraud on their part. T & J counterclaimed against Dale and instituted a third party complaint against O. K., seeking recovery against both parties in quantum meruit for the value of ground fill and services they furnished over and above the $5,100 they had already received from Dale. O. K. filed a motion to dismiss T & J's third party complaint against it. The trial court treated this motion pursuant to stipulation by T & J and O. K., as a motion to sever the cause set forth in the complaint, from that set forth in the third party complaint. Pursuant to further stipulation, the trial court consolidated both causes for purposes of trial only. T & J filed a motion for summary judgment against Dale which the trial court denied as to Count I of Dale's complaint but granted as to Count II. At the same time the court granted Dale leave to amend its complaint.

The cause was tried before the trial court on April 2, 1973. At the conclusion of Dale's case on the alleged breach of the subcontractual agreement, T & J moved for involuntary dismissal and this motion was granted. The trial court found that the purported subcontract entered into between Dale and T & J was uncertain, lacked mutuality of obligation, did not contain sufficient standards upon which T & J could determine their obligations under the agreement, and therefore ruled the subcontract unenforceable. T & J then proceeded with the trial of their cause of action founded in quantum meruit. At the end of their case, Dale moved to dismiss T & J's counterclaim against it. The motion was granted. O. K. moved at this time to dismiss T & J's third party complaint against it. This motion too was granted. It is from judgments on these motions that the appeals have been brought.

T & J argue that they did not enter into a valid and enforceable written contract with Dale because of the uncertainty as to the quantity of fill to be furnished in the purported subcontract. They contend that the parties never agreed as to the amount of fill to be provided, nor established an ascertainable standard for determining obligations under the subcontract. It is their view that there was no meeting of the minds of the parties. T & J therefore maintain that the trial court was correct in finding that the subcontract in question with Dale was unenforceable. However, they believe that the trial court was incorrect in dismissing their counterclaim founded in quantum meruit for the reasonable value of the services they rendered and the material they furnished while working on the O. K. Car Wash site. We find merit in T & J's arguments.

█ It is essential to an enforceable contract that it be sufficiently definite and certain in its terms and requirements so that it can be determined what acts are to be performed and when performance is complete.[1] As Corbin in his treatise on contracts notes:

> "A court cannot enforce a contract unless it can determine what it is. It is

1. *See* Jack Richards Aircraft Sales, Inc.' v. Vaughn, 203 Kan. 967, 457 P.2d 691 (1969) ;

Landgraver v. DeShazer, 239 Or. 446, 398 P.2d 193 (1965) ; Aztec Film Productions

not enough that the parties think that they have made a contract; they must have expressed their intentions in a manner that is capable of understanding. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have been held to prevent the creation of an enforceable contract," [2]

The crucial provision of the purported subcontract is Article 2, which attempts to set forth the quantity of fill that T & J were required to deliver. It reads:

"The subcontractor shall furnish all labor, materials and equipment and shall perform all the work for All necessary pit run sand and gravel to backfill lot located at Orchard and Overland to rough grade 4″ of finish grade. These grades to be finally determined by paving contractor so suitable grade will exist. This does not necessarily fit plot plan as shown. Rough graded and lifts not to exceed one foot so adequate compaction can be accomplished. In areas where lot is high grade off and save enough top soil to adequately fill planters."

■ This clause does not establish with sufficient definiteness and clarity the quantity of fill that T & J were expected to provide. A party will not be subjected to a contractual obligation, where the character of that obligation is so indefinite and uncertain as to its terms and requirements that it is impossible to state with reasonable certainty the obligation involved.[3]

■ It is true that Article 1 of the purported subcontractual agreement between Dale and T & J incorporated by reference the plans and specifications submitted by O. K. to Dale on the car wash site. However the plans and specifications did not provide a frame of reference from which T & J could reasonably have determined the amount of fill that was required of them. The plot plans which T & J inspected did not indicate what the finished grade was to be on the car wash lot. Even if it had, Article 2 specifically provided that the plans and specifications were not necessarily governing. "This does not necessarily fit plot plan as shown." The contract was prepared by Dale, and it must bear the responsibility for the indefiniteness of the terms.[4]

While we agree with the trial court's determination that the purported subcontract between T & J and Dale was unenforceable because of uncertainty, we can not agree with its disposition of T & J's counterclaim against Dale founded in quantum meruit. The trial court dismissed T & J's counterclaim against Dale, but allowed T & J to retain any payments that they had received from Dale paid pursuant to the purported subcontract. Its ruling in effect was that when dealing with an unenforceable contract, the court will leave the parties where it finds them.

■ Where a party has performed services or furnished material for another, even though it be pursuant to an invalid or unenforceable contract, the law recognizes that a right to recover the reasonable value of the services provided and materials furnished may lie in quantum meruit.[5] In

v. Tucson Gas & Electric Co., 11 Ariz.App. 241, 463 P.2d 547 (1969).

2. 1 Corbin on Contracts 394, § 95 (1963).

3. *See* Dunn v. Dunn, 391 P.2d 885 (Okl. 1964); Bunnell v. Bills, 13 Utah 2d 83, 368 P.2d 597 (1962); 17 Am.Jur.2d, Contracts § 75 at 413, § 81 at 422.

4. *See* Dunford v. United of Omaha, 95 Idaho 282, 506 P.2d 1355 (1973).

5. *See* Evans v. Mason, 82 Ariz. 40, 308 P.2d 245 (1957); Brakensiek v. Shaffer, 203 Kan. 817, 457 P.2d 511 (1969); Cone v. Ariss, 13 Wash.2d 650, 126 P.2d 591 (1942); Lorang v. Flathead Commercial Co., 112 Mont. 146, 119 P.2d 273 (1941); 66 Am.Jur. 2d, Restitution and Implied Contracts § 61 at 1007.

other words, where one furnishes labor or provides material to another pursuant to a contract which is later found to be unenforceable and of no effect, the party rendering the services may recover the value thereof upon quantum meruit, on the basis of an implied promise to pay for the reasonable value of the services.[6] As this Court noted in Fairchild v. Mathews,[7] after affirming the trial court's determination that there had been no meeting of the minds or definite agreement reached by the parties,

> "The lower court therefore had no alternative except to resolve this issue on the basis of quantum meruit, i. e., to allow the respondent the reasonable value of services performed upon appellant's land to appellant's benefit."

We believe that this principle is applicable to the case at hand.

Under a quantum meruit theory, the proper measure for recovery is the value of the actual benefit realized and retained by the recipient of the services and material.[8] To arrive at this figure, the trial court on remand should:

1. Compute the fair market value of the services provided and material furnished by T & J before being terminated by Dale, considering the necessity to cure any substandard work,

2. Less the remuneration T & J have already received from Dale for performing their services and furnishing the fill.

This figure will reflect the reasonable value to Dale of the services and material provided by T & J to it.

We do not believe that T & J have a basis for recovery against O. K. under a quantum meruit theory. The general rule in this area is that a subcontractor who furnishes material or labor pursuant to an agreement with, or upon the order and credit of a general contractor cannot recover against the property owner upon the basis of an implied promise to pay arising from the owner's receipt and acceptance of the benefit of the material and labor furnished.[9] Thus it is said that a landowner will not be held liable for work or material furnished by a subcontractor to a contractor, pursuant to a contractual arrangement between the contractor and subcontractor, where the landowner is not a party to this contractual arrangement.[10]

Throughout the construction of the car wash facility, T & J believed themselves to have been, and behaved as if they were subcontractors working for Dale, the general contractor. Hobson so advised them when they executed the subcontractual agreement on April 22, 1971. Garland Jones & Emmett Todd both testified that they understood this was the nature of their working relationship. T & J performed under Dale's supervision, who accepted the benefits of their labor. There was never any agreement on O. K.'s part to compensate T & J for their work. While there was some testimony that Fred Bennett, acting on behalf of O. K., stated that he would talk with his principal and attempt to get T & J additional money, there was no evidence that he actually agreed to pay more money.

6. See Jackson v. Sam Finley, Inc., 366 F.2d 148 (5th Cir. 1966) ; Anderson v. Zweigbaum, 150 Conn. 478, 191 A.2d 133 (1963) ; Miller v. Greene, 104 So.2d 457 (Fla.1958) ; Ricks v. Sumler, 179 Va. 571, 19 S.E.2d 889 (1942) ; Vickery v. Ritchie, 202 Mass. 247, 88 N.E. 835 (1909).

7. 91 Idaho 1, 5, 415 P.2d 43, 47 (1966).

8. See Fairchild v. Mathews, supra n. 7 ; Weber v. Eastern Idaho Packing Corporation, 94 Idaho 694, 496 P.2d 693 (1972).

9. See Cohen v. Delmar Drive-In Theatre, 7 Terry 427, 46 Del. 427, 84 A.2d 597 (1951) ;

Chatfield v. Fish, 126 Conn. 712, 10 A.2d 754 (1940) ; Custer Builders, Inc. v. Quaker Heritage, Inc., 41 A.D.2d 448, 344 N.Y.S.2d 606 (1973) ; Johnson v. Kidd, 108 Ga.App. 53, 131 S.E.2d 861 (1963) ; 13 Am.Jur.2d, Building and Construction Contracts § 29 ; but contra Paschall's, Inc. v. Dozier, 219 Tenn. 45, 407 S.W.2d 150 (1966).

10. See Johnson & Peterson, Inc. v. Toohey, 285 Minn. 181, 172 N.W.2d 326 (1969) ; Lundstrom Construction Company v. Dygert, 254 Minn. 224, 94 N.W.2d 527 (1959) ; Porter v. Marotta, 267 S.W.2d 222 (Tex.Civ.App. 1954).

It is true that there is an exception to this general rule under the mechanic's lien laws, where if a subcontractor is not paid, he may enforce his claim for compensation directly against the landowner.[11] However, T & J did not avail themselves of this remedy, and therefore this exception is inapplicable to the case at hand.

To summarize: we affirm the trial court's dismissal of Dale's claim against T & J; we affirm the trial court's dismissal of T & J's counterclaim against O. K.; but we reverse the trial court's dismissal of T & J.'s counterclaim against Dale and remand for proceedings in conformity with this opinion.

No costs allowed.

McFADDEN, DONALDSON, SHEPARD and BAKES, JJ., concur.

11. *See* Weber v. Eastern Idaho Packing Corporation, *supra* n. 8; I.C. § 45–501; Hill v. Twin Falls Salmon River Land and Water Co., 22 Idaho 274, 279, 125 P. 204, 206 (1912).