**INTERFORM COMPANY,
Plaintiff-Appellee,**

v.

**Leslie L. MITCHELL, d/b/a Mitchell Construction Company, and St. Paul Fire & Marine Insurance Company, Defendants-Appellants.**

**INTERFORM COMPANY,
Plaintiff-Appellant,**

v.

**Leslie L. MITCHELL, d/b/a Mitchell Construction Company, and St. Paul Fire & Marine Insurance Company, Defendants-Appellees.**

**Nos. 75–3075 and 75–3217.**

United States Court of Appeals, Ninth Circuit.

May 3, 1978.

As Amended on Denial of Rehearing June 2, 1978.

Phillip M. Barber, Donald E. Knickrehm, Boise, Idaho, for defendants-appellants.

Allan J. Joseph, of Pettit, Evers & Martin, San Francisco, Cal., for plaintiff-appellee.

Before BARNES and SNEED, Circuit Judges, and JAMESON,* District Judge.

SNEED, Circuit Judge:

## I.

### Introduction.

The appellant Mitchell Construction Company used certain forms which belonged to Interform Company for molding concrete on two construction jobs it performed as prime contractor for the State of Idaho. Interform received $32,000 from Mitchell which Mitchell contended was the purchase price of the forms. Interform contended the $32,000 was a rental payment for use of the forms on Mitchell's first job. Consequently, in the district court Interform sought payment for Mitchell's use of its forms on the second job, and the return of its forms. Mitchell sought a decision giving it ownership of the forms and general and punitive damages for abuse of process.

The district court in a trial without a jury found that the parties had in fact entered into a contract in September 1971 for the rental of the forms for use in Mitchell's first job. It found that no oral or written agreement had been entered into for use of the forms in the second job; rather, Mitchell had used the forms "despite knowledge on his part that Interform was claiming ownership . . . and claimed a right to payment by Mitchell of additional rentals for further use of the forms." The use of the forms in the second job, the court found, benefited Mitchell and caused detriment to Interform. Finding also that Interform had not "volunteered" the free use of its forms, the court concluded that Mitchell had been unjustly enriched by its use of the forms. It found the fair rental value for the second job to have been $29,250 and, after deducting certain expenditures by Mitchell, awarded $26,750 to Interform. It denied Mitchell's counterclaim and declined to award attorney's fees to Interform. We affirm in all respects except as to attorney's fees. As to these we believe the trial court erred. We reverse and remand for further proceedings with respect to these.

## II.

### Facts.

Many of the pertinent facts were sharply disputed by the parties. Our statement of the facts will indicate the major areas of conflict. Preliminary negotiations in the spring and summer of 1971 without question centered entirely upon the rental of forms. On September 8, Mitchell, President of Mitchell Construction Company, and Miller, a salesman for Interform, drove around Seattle in order to observe some of Interform's concrete forms in use. As Miller was driving the group to a restaurant, Mitchell stated that he would be interested in purchasing the forms. Miller was surprised at this comment and testified that he "thought at first he was kidding, because up to that point no one had mentioned anything about a sale, and all of our quotes had been straight rental." (Tr.78).

Mitchell contends that the contract of sale was agreed to orally at that time, and was confirmed by a document which Mitchell sent to Interform. That document, admittedly backdated to September 8, was written between September 13 and 17 and was received by Interform on September 21. (See Document 1, Appendix). Entitled "Purchase Order," it requested Interform to "furnish" forms according to size and quantity specifications set forth therein. It also set price, time and payment terms, and contained the condition that "[i]f Mitchell Construction Company does the hauling, which is their option, there will be an allowance of $.43 per loaded mile."

* Hon. William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

Mitchell asserts that this sales agreement reflected an agreement arrived at during the tour of September 8. Miller, on the other hand, testified that he did not have authority to set a sales price, and that his attempt that day to contact Dashew, the President of Interform, by telephone to receive instructions was unsuccessful. Miller's version, which the trial judge chose to accept, was supported by testimony of the pilot who had flown Mitchell to Seattle and accompanied him on the tour. The trial judge also agreed with Interform that the contract was arrived at during a telephone conversation on September 13 between Mitchell and Dashew, at which time a rental agreement as to quantity and price was reached.

On September 14, a "speed memo" (See Document 3, Appendix) was sent from Mitchell's general superintendent to Miller asking: Jim, Have you ordered the Pans? What is the delivery date? Are you sending shape drawings? Are you sending Freight rate allowance? When we get this information we will send a P.O. for proper amount. We wish to check this frieght [sic] first." The freight issue was settled shortly thereafter, because the "purchase order" discussed above, drawn between September 13, and 17, sets forth a resolution of the question.

Several days after Mitchell's purchase order was dispatched, a confirmation was sent by Interform, set forth on a second sheet of Mitchell's standard purchase form (See Document 2 and n.5, Appendix) and also containing the word "furnish." Three bills of lading and three invoices (See Documents 4 and 5, Appendix) from Interform followed, each specifically referring to the "rental" of the forms. No one at Mitchell objected to these six documents. At trial Mitchell, his general supervisor and his jobs supervisor testified that they had never seen or checked the invoices or bills of lading. The trial court judge chose not to believe this, nor did he find credible other inconsistent testimony offered by Mitchell. He did, however, accept Interform's evidence of a custom within the construction trade by which builders would order equipment for rental on purchase forms.

### III.

### Analysis.

As this case arises under our diversity jurisdiction, we are bound to apply, as best we can, Idaho's common law of contracts, as well as its interpretation of relevant provisions of the Uniform Commercial Code. Our review in this case is further constrained by our obligation to accept factual determinations by the district court which are not clearly erroneous. The resolution of the credibility of conflicting witnesses, crucial to this case, is such a factual determination. *Metro-Goldwin-Mayer Corp. v. Fear,* 104 F.2d 892, 897 (9th Cir. 1939); *Comish v. Smith,* 97 Idaho 89, 540 P.2d 274, 276 (1975); *Crenshaw v. Crenshaw,* 68 Idaho 470, 199 P.2d 264, 268 (1948). Aware of these constraints, our review must begin by focusing on the documents presented by Mitchell as constituting the contract. These consist of Mitchell's purchase order and Interform's confirmation. Mitchell insists that these documents were intended to be the final expression of their agreement, i. e., an integration of all previous undertakings into two documents, and that parol evidence is not admissible to vary their meaning. Moreover, their meaning is that which a reasonably intelligent person would give to them unaided by any prior or contemporaneous statements by the parties thereto. We shall address this contention first and then turn to the trial court's disposition of Interform's claim with respect to the second job. Finally, we will consider certain claims by Mitchell, St. Paul Fire and Marine Insurance Company, and Interform with respect to the surety bond and attorney's fees.

### A. Integration and Interpretation.

Appellant's contention regarding the two purchase orders brings to the fore principles of contract law pertaining to the integration of writings and the interpretation of written contracts, the formal statement of which provides inadequate warning of the

complexity that attends their application. Thus, the Idaho Supreme Court many years ago observed:

"In the construction of a contract, the court will endeavor to arrive at the real intention of the parties, and will consider the facts and circumstances out of which the contract arose, and will construe the contract in the light of such facts and circumstances."

*Wood River Power Co. v. Arkoosh,* 37 Idaho 348, 215 P. 975 (1923).

Also in determining whether the intention of the parties is to be ascertained only from the written agreement that Court has stated:

"Where preliminary negotiations are consummated by written contract, the writing supersedes all previous understandings and the intent of the parties must be ascertained from the writing."

*Nuquist v. Bauscher,* 71 Idaho 89, 94, 227 P.2d 83 (1951). These pronouncements, by no means unique or complex, obscure more than reveal the existence of a fundamental difference concerning the manner in which integration and interpretation should be approached. That difference relates to how a writing is to be viewed and the respective roles of the judge and jury.

One view is to treat the writing as having a unique and quite compelling force. Under that approach a writing "supersedes all previous undertakings" when the writing taken as a whole appears complete and the alleged additional terms ordinarily and naturally would have been included in the writing by reasonable parties situated as were the parties to the writing. *See* Calamari and Perillo, *Contracts,* 103–111 (1977) [hereinafter Calamari & Perillo]. Also a writing which so supersedes all previous undertakings, i. e., which is integrated, means what a reasonably intelligent person, "acquainted with all the operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration[,] other than the oral statements made by the parties to each other as to what they intended it to mean," would understand it to mean. *Id.* at 118. 4 *Willi-*

ston on Contracts §§ 607, 631 (1961) [hereinafter Williston]; *Restatement, Contracts* § 230. The writing becomes the focus of attention and the judge by assuming the function of a reasonable person determines whether the writing did supersede all previous undertakings and, if so, its meaning to a reasonable person situated as described above. Williston §§ 616–17. An integrated writing clear in meaning to the reasonable person constitutes the contract between the parties. In this manner the judge can fix the legal relations of the parties without aid of a jury and provide a measure of security to written agreements. *McCormick on Evidence* §§ 214–16 (1954); Calamari & Perillo 100; Williston §§ 616, 633.

Another, and opposing view, imparts to the writing no unique or compelling force. A writing is integrated when the parties intend it to be and it means what they intended it to mean. *Corbin on Contracts* § 581 at 442, § 582 at 448–57, § 583 at 485 (1960) [hereinafter Corbin]; *Restatement (Second), Contracts* § 21A; Williston § 605; *Restatement, Contracts* § 240(b), comment a; § 238, comments a, b. In theory, therefore, integration may be lacking even if the additional terms ordinarily and naturally would have been included in the writing and an integrated writing can have a meaning to which a reasonably intelligent person, situated as described above, could not subscribe. Corbin § 544 at 145–46. Again, in theory, this view accords the jury, when the trial employs one, a potentially larger role in the process of fixing contractual relations and provides somewhat less security to written agreements.

In practice, however, the difference between the two views is less significant than one might imagine. A writing, which ordinarily and naturally would be an integrated one, generally is one the parties thereto intended to be integrated. Also, the meaning to which the reasonably intelligent person would subscribe generally is that to which the parties did subscribe. Under both views, the judge makes the initial determinations; if the writing is integrated, evidence of an alleged collateral agreement

is excluded, and, if the meaning is clear or unambiguous, evidence tending to show a different meaning will not be received. Where the writing is not integrated or its meaning not unambiguous, parol evidence is admissible under both views. Also under both views once parol evidence is admitted, a finding, possibly by the jury, that the parties were not of one mind as to a material term requires an assessment of comparative responsibility for the misunderstanding. Corbin §§ 538–39 (1960); *Restatement (Second), Contracts* § 21A; Williston § 605; *Restatement, Contracts* § 233. Where each is equally responsible no contract exists, at least with respect to the disputed matter. *Restatement, Contracts* §§ 71, 233. Where the responsibility rests exclusively on one party (e. g., the promisor knew or should have known that the promisee did. not understand the promise as he did) the understanding of the other (the promisee in this example) prevails. *Id.* at § 233. Situations between equal and exclusive responsibility impose burdens of judgment to determine the location of the greater responsibility.

There are, however, significant differences between the two views. To suggest none exist would reduce the debate between their respective leading protagonists, Williston with regard to the first and Corbin the second, to a triviality. The debate is not that. It relates, as indicated, to the attitude with which judges should approach written contracts. Williston requires the judge to ascertain the legal relations between the parties by reference to those associated with the "forms" (that is, the natural and normal integration practices and the meaning of words that reasonably intelligent people would employ) to which

they should adhere and from which they depart at their peril. Calamari & Perillo 104–05; Williston §§ 633, 638–39. Corbin, on the other hand, directs the judge to fix the legal relations between the parties in accordance with their intention even when the "forms" they employed suggest otherwise. Corbin §§ 538–42A. A judge, guided by Williston, in the case before us would impose upon the parties the terms of the "purchase orders" as understood by the reasonably intelligent person if the "purchase orders" appear complete and any additional terms ordinarily and naturally would have been included therein. Williston §§ 638–39; Calamari & Perillo 105. A judge, guided by Corbin, would impose upon the parties the agreement that the evidence indicates they in fact reached. It is understandable that Mitchell urges us to proceed as Williston would have us; it is equally clear why Interform prefers Corbin's way.

It is unlikely that any jurisdiction will inflexibly adopt one approach to the exclusion of the other; each is likely to influence the conduct of judges and the disposition of cases. However, it must be acknowledged that the influence of Corbin's way is stronger now, *id.* at 111, than when he and Williston grappled during the drafting of the American Law Institute's first Restatement of Contracts. *Cf.* American Law Institute, *Proceedings,* vol. 111 at 194–96 (1925); vol. VI at 349–54 (1928); [1] *see* vol. VII at 266 (1929); Whittier, The Restatement of Contracts and Mutual Assent, 17 *Cal.L.Rev.* 441 (1929); Whittier, The Restatement of Contracts and Consideration—Two Angles of Approach, 18 *Cal.L.Rev.* 611 (1930). Evidence of this is present in *Nysignh v. Warren,* 94 Idaho 384, 488 P.2d 355 (1971), in which the Idaho Supreme Court observed:

1. "Mr. Williston: Section 183 [dealing with the Statute of Frauds], I should say, is a section that has excited a good deal of controversy . . . .. My Adviser, Mr. Corbin, has written a very learned article taking the opposite view to that expressed in the draft . . . .."

"Mr. Corbin: Mr. President, I did not come prepared to make an argument against Mr. Williston on this. My function has been to make arguments with Mr. Williston; and, having failed there, I have been practically always content to leave it to his final conclusion . . .

I can make one or two statements in regard to the subject. The first is that an extended reading of the cases . . . has convinced me that the Statute of Frauds is honored in words, but not in application; and it has convinced me also that it ought not to be, as a matter of social and judicial policy, honored in application. The purposes and motives that lay behind the passing of the Statute of Frauds . . are not properly applicable under our present social conditions . . . .." Vol. VI at 349–50.

"Appellant urges the application of the general rule articulated by this court in *Nuquist v. Bauscher,* 'Where preliminary negotiations are consummated by written agreement, the writing supersedes all previous understandings and the intent of the parties must be ascertained from the writing.' This rule governs only when the integrated character of the writing is established. Whether a particular subject of negotiation is embodied in the writing depends on the intent of the parties, revealed by their conduct and language, and by the surrounding circumstances. Mere existence of a document does not establish integration. [In a footnote the court said: . . . An earlier view, expressed in *Thompson v. Libby,* 34 Minn. 374, 26 N.W. 1, 2 (1885), that the only criterion of the completeness of a written contract is the writing itself is no longer authoritative. . . .]"

■ Moreover, Idaho Code § 28–2–202, a provision of Idaho's version of Article II of the Uniform Commercial Code, reflects Corbin's influence.[2] It precludes contradiction of "confirmatory memoranda" by prior or contemporaneous oral agreements when the writing was *"intended* by the parties as a final expression of their agreement" and permits the introduction of consistent additional terms "unless the court finds the writing to have been *intended* also as a complete and exclusive statement of the

terms of the agreement." (Italics added). The focus plainly is on the intention of the parties, not the integration practices of reasonable persons acting normally and naturally. This is Corbin's focus. Furthermore, portions of the "Comment To Official Text," set forth in the margin,[3] reject certain rules more applicable to Williston's approach than to Corbin's.

■ Idaho law being, in its relevant parts, infused with Corbin's spirit, the trial judge in this case was acting within both its spirit and letter when he admitted evidence extrinsic to the purchase orders to determine whether the transaction was a sale or a lease. Of particular importance to the trial judge's determination was the exchange of correspondence and quotations prior to September 8, the six invoices and bills of lading (see Documents 4 and 5, Appendix), as well as evidence of a trade custom indicating that builders normally used purchase order forms when requesting rentals. This evidence enabled him to derive the contract from the September 13 phone conversation between Dashew and Mitchell, the speed memo of September 14 from Mitchell which corroborates the existence of an agreement regarding the forms while evidencing uncertainty as to freight terms, and the purchase order of Mitchell which Interform confirmed and which resolved the freight issue.

2. This section, captioned "Final written expression—Parol or extrinsic evidence—," is applicable to the transaction before us in this case inasmuch as Article II has been held to be applicable by analogy to leases as well as sales when such application would serve to minimize any conflict between the two and when both serve in their relevant aspects identical functions. *Glenn Dick Equipment Co. v. Galey Construction, Inc.,* 97 Idaho 216, 220–23, 541 P.2d 1184, 1188–91 (1975). It is obvious that, without regard to whether the transaction before us is a lease or a sale, the rule of § 28–2–202 to the extent of its scope should be applicable. To hold otherwise would defeat Idaho's policy of minimizing conflict in the legal rules applicable to these two forms of transferring property interests. In addition, distinct rules could create an analytic impasse; to determine whether a lease or sale would require a choice of the applicable rule, but the

choice of the applicable rule would turn on whether the transaction is a lease or sale.

3. "Purposes:
1. This section definitely rejects:
(a) Any assumption that because a writing has been worked out which is final on some matters, it is to be taken as including all the matters agreed upon;
(b) The premise that the language used has the meaning attributable to such language by rules of construction existing in the law rather than the meaning which arises out of the commercial context in which it was used; and
(c) The requirement that a condition precedent to the admissibility of the type of evidence specified in paragraph (a) is an original determination by the court that the language used is ambiguous." Idaho Code § 28–2–202, Comment To Official Text.

We find no error under Idaho law in the evidence the trial judge considered or the conclusions he reached. It is clear that Mitchell's and Interform's purchase orders were not "intended by the parties as a final expression of their agreement," Idaho Code 28–2–202, and that the intent of the parties must be derived from all the documents employed, the circumstances surrounding their execution, and the subsequent conduct of the parties. Moreover, under Idaho law we believe there exists no compulsion that the intent of the parties be only what a reasonably intelligent person would have understood their intent to be after examining only Mitchell's and Interform's purchase orders.

Finally, we hold that the lease contract which the trial judge discerned from the evidence was sufficiently definite and certain as to terms. There exists no difficulty in determining what acts are to be performed and when performance is complete. *See Dale's Service Company, Inc. v. Jones*, 96 Idaho 662, 534 P.2d 1102 (1975).

B. Interform's Claim With Respect to the Second Job.

Mitchell's use of the forms during the second job was not pursuant to an express contract for sale or lease. The trial court found that a valid rental agreement existed only with respect to the first job and that there was no contract to sell the forms. Thus the use of the forms on the second job presents a situation which under Idaho law permits a recovery in quantum meruit. *Dale's Service Company, Inc. v. Jones, supra; Fairchild v. Mathews*, 91 Idaho 1, 415 P.2d 43 (1966); *Weber v. Eastern Idaho Packing Corp.*, 94 Idaho 694, 496 P.2d

693 (1972). The trial judge recognized this when he characterized Interform's claim as one for "unjust enrichment." Although Idaho law appears to measure recovery under quantum meruit by the fair market value of the goods or services received and used by the defendant, while under "unjust enrichment" the focus is on the value of the benefit which it would be unjust for the defendant to retain, Idaho has also recognized that generally there is no difference between the two.[4] Mitchell, however, argues that in this instance there is a difference because Interform's product is overpriced. This more accurately suggests that the rental agreed to with respect to the first job is not a proper measure of the fair market value of the forms than that there exists a difference in the measure of recovery between quantum meruit and unjust enrichment. Mitchell also suggests that recovery should be measured by the extent to which its assets were increased by the use of the forms, analogizing his situation to that of a defendant whose land has been improved by the construction of unbargained for improvements. *See Nielson v. Davis*, 96 Idaho 314, 528 P.2d 196 (1974). The trial judge properly did not employ this less precise standard when a just and more precise one was available.

This more just and precise standard was the rental price ($32,000) fixed by the parties in their contract covering the first job, reduced by $2,750, the cost of transporting the forms to the jobsite which Interform avoided with respect to the second job, plus $2,500, the cost to Mitchell of cleaning, moving, and repairing the forms. The net figure, $26,750, is a proper measure of Interform's recovery. In awarding this amount the trial judge did not err.

4. A distinction appears in Idaho law between a recovery in quantum meruit, where the parties have attempted to contract but the contract is void or unenforceable, and a recovery in unjust enrichment where there was never any attempt to arrive at a contract. *Compare Dale's Service Station, Inc. v. Jones, supra* at 1105–06 and *Weber v. Eastern Idaho Packing Co.*, 94 Idaho 694, 496 P.2d 693, 696 *with Hixon v. Allphin*, 76 Idaho 327, 281 P.2d 1042 (1955) *and Continental Forest Products, Inc.*, 95 Idaho 739, 518 P.2d 1201, 1205–06 (1974). In both situa-

tions, however, the recovery granted is not based upon a contract and in both the underlying standard for the recovery is the net benefit conferred upon the defendant. As suggested in the text, although the formula by which such benefits are measured may vary, in most commercial contexts the recovery will be identical under either the quantum meruit or unjust enrichment line of cases, *Continental Forest Products, Inc. v. Chandler Supply Co., supra* at 1206.

## C. Recovery Against Surety and Award of Attorney's Fees.

Mitchell and St. Paul Fire & Marine Insurance Company allege that Interform may not recover against St. Paul both because under Idaho law recovery on public contract bonds is not permitted for claims for unjust enrichment and because suit for payment was not timely filed. It also follows, according to appellants, that the district court was correct in refusing to award Interform attorney's fees under the bond.

Although no Idaho cases dealing with the right to recover on a public contract bond for a claim such as Interform's have been brought to our attention, the provisions of the Idaho Public Contract Act are almost identical to those of the federal Miller Act, 40 U.S.C. § 270a–d. Recognizing this, the Idaho Supreme Court held in *City of Weippe v. Yarno*, 96 Idaho 319, 528 P.2d 201 (1974) that state law with regard to suit on payment bonds follows the provisions of the federal act and should be interpreted consistently with it.

Both section 270b of the Miller Act, and Idaho Code § 54–1927 grant a right of action on a payment bond, securing the obligations of a prime contractor, to a claimant who has a "contractual relationship express or implied" with a prime contractor, and, when the relationship is solely with a subcontractor, upon the giving of written notice to the prime contractor. *See J. W. Bateson Co. v. Board of Trustees*, 433 U.S. 907, 98 S.Ct. 873, 55 L.Ed.2d 50 (1978). It has been held that within the intendment of the Miller Act, "implied contract" includes contracts implied-in-fact and recoveries in quantum meruit, but excludes implied-in-law contracts and recoveries for unjust enrichment. *See* note 3, *supra*. *Fidelity & Deposit Co. of Maryland v. Harris*, 360 F.2d 402, 408–10 (9th Cir. 1966); *Central Steel Erection Co. v. Will*, 304 F.2d 548, 552 (9th Cir. 1962).

If the relationship between Interform and Mitchell regarding the use of the forms on the second job lacked any transactional link to an express or implied-in-fact contract, we might well conclude that Idaho law would bar recovery by Interform on the surety bond. Here, however, the district court also found a direct contractual relationship between Interform and Mitchell with respect to the first job. Mitchell's possession and use of the forms on the second job was possible only because of the contractual relationship between the parties on the first job. There exists a firm and significant transactional link between the first job's express contract and use of the forms on the second job. The limitations under the Miller Act are intended to reduce the number of claimants unknown to the contractor, not to discriminate among several valid claims presented by a supplier who had an express contractual relationship with a prime contractor to which all claims are functionally related. *See Fidelity & Deposit Co. of Maryland v. Harris, supra* at 408–11. Since Interform had such a relationship with Mitchell, we hold that the district court did not err in concluding that Interform has a right of action on the bond both under the rental contract and for claims arising from Mitchell's subsequent retention of the forms.

Mitchell and St. Paul also claim, however, that the suit on the bond was not timely filed. Idaho Code § 54–1927 provides that suits on payment bonds for public contracts may not be brought after "one (1) year from the date on which the claimant performed the last of the labor or furnished or supplied the last of the materials for which such suit is brought . . . ." It is contended that this date was November 1971 when Interform last delivered the forms to Mitchell for use on the first job. The district court found, however, that the date relevant for the purposes of the statute is the time when the forms were furnished for the second job; this occurred on or after May 7, when Mitchell was awarded the contract for that second job. (R. 122). As the suit was filed on February 7, 1974, the court found it is not barred by the Idaho statute of limitations.

The district court failed to note that claims for attorney's fees and the claim

under the surety bond against St. Paul were added only on May 19, 1974 when an amended complaint was filed. This raises the question whether the amendment relates back to the original complaint for purposes of the statute of limitations as provided for in Fed.R.Civ.Proc. 15(c). This question need not be reached, however, since we are convinced that Interform "furnished or supplied the last of the materials" well after May 19, 1973. Under the analogous Miller Act, see *City of Weippe v. Yarno, supra,* a furnisher of rental equipment continues to "supply" such equipment through the entire rental period; the date of last supply occurs not at the beginning of a job but at the end or at the time the equipment is last available for use on the job. See *Mike Bradford & Co. v. F. A. Chastain Construction Co.,* 387 F.2d 942 (5th Cir. 1968) (interpreting 40 U.S.C. § 270b(b); *United States v. Benco Construction Co.,* 248 F.Supp. 504 (W.D.Md.1965) (same); *see also United States v. Campbell,* 293 F.2d 816 (9th Cir.), *cert. denied,* 368 U.S. 987 (1961) (interpreting 40 U.S.C. 270b(a)); *United States v. Scotland Concrete Co.,* 294 F.Supp. 1299 (E.D.N.C.1968) (same); *United States v. Continental Casualty Co.,* 230 F.Supp. 557 (W.D.Pa.1964) (same). Interform began to negotiate for use of its forms on the second job on May 24, 1973 (exhibits 13–15); the forms were used on the job during the summer of 1973 (R.T. 204); thus the date on which these forms were "last available for use on the project" was well within the one-year period prior to May 19, 1974; *see United States v. Campbell, supra* at 820.

 The district court in refusing to award attorney's fees to Interform said "no basis upon which to award plaintiff attorney's fees [exists] in this action." (R.T.123). We believe this conclusion is erroneous. We must, of course, follow Idaho law as to attorney's fees in this diversity action; *see People of Sioux County v. National Surety Co.,* 276 U.S. 238, 48 S.Ct. 239, 72 L.Ed. 547 (1928); 6 *Moore's Federal Practice* ¶ 54.-77(a) at 1712–13 (1976). Having concluded that Interform was entitled to sue on the payment bond under Idaho Code § 54–1927, it follows that Interform is entitled to attorney's fees under § 54–1929 which provides:

In any action brought upon either of the bonds provided herein, or against the public body failing to obtain delivery of the payment bond, the prevailing party, upon each separate cause of action, shall recover a reasonable attorney's fee to be taxed as costs.

The Supreme Court of Idaho has stated that the trial judge, who is in a position to assess the complexity of the case, time involved, the volume of pleadings, etc., may make a determination of reasonable attorney's fees without requiring formal proof and that failure to grant such fees is reversible error. *Flynn v. Allison,* 97 Idaho 618, 622, 549 P.2d 1065, 1069 (1976). Therefore, we must remand this case to the district court for a determination of reasonable fees in light of the factors set out in *Flynn v. Allison,* observing as we do so that Idaho law appears not to prevent the judge from requesting additional information to assist him in arriving at his determination.

Affirmed in Part; Reversed and Remanded in Part.

APPENDIX to follow.

## APPENDIX

Document 1. Purchase Order.[5]

### PURCHASE ORDER

## Mitchell Construction Co.

601 INDUSTRIAL LANE - PHONE 232-8519 237-11
P. O. Box 510 - POCATELLO, IDAHO 83201
September 8, 1971 232 6446

Admitted No. 3
Plaintiff's Exhibit
MARK THIS ORDER

No. 995 JOB # 298

ON ALL PACKAGES, BILLS OF LADING AND INVOICES, INCLUDE PACKING SLIP WITH EACH SHIPMENT.

SHIP TO State of Idaho Corrections

Institution

Boise, Idaho

TO ADDRESS
INTERFORM

1038 Princeton Drive

Venice, California

SHIP F. O. B. JOB SITE ☒YES ☐NO

Terms 25% Deposit. B.H. with DC.

VIA

| QUANTITY | PART NUMBER AND DESCRIPTION | UNIT PRICE | PRICE |
|---|---|---|---|
| | FURNISH FORM PANS ACCORDING TO PLANS & SPECIFICATIONS & ALL | | |
| | APPLICABLE ADDENDA: | | |
| 496 ea. | 3'-2" x 3'-2" x 1'-3" | | |
| 272 ea. | 3'-2" x 2'-11" x 1'-3" | | |
| 32 ea. | 2'-11" x 2'-11" x 1'-3" | | |
| | Legs to be 6" wide, allow ¼" strong between flanges for ¼" Tee | | |
| | mold, as discussed. Delivery F.O.B. Jobsite, 45 days or less.... | | $32,000.00 |
| | | | |
| | | | |
| | **No additional costs will be authorized** | | |
| | **without a purchase order issued by** | | |
| | **Mitchell Construction Co.** | | |
| | (NOTE: If Mitchell Construction Company does the hauling, which is their option, there will be an allowance of $ .43 per loaded mile.) | | |

Date of Delivery: on or before___45 days or less___Liquidated damages will be charged against the supplier at

the rate of_____ per day for each and every calendar day the supplier shall be in default after the date specified above.

**CONDITIONS**
ALL COLLECT FREIGHT INVOICES RECEIVED BY THE PURCHASER ON FREIGHT ALLOWED PURCHASE ORDERS WILL BE BACK CHARGED WITH OVERHEAD AND PROFIT ADDED TO THE FREIGHT INVOICE COST.
IN EVENT THAT A STATEMENT HAS NOT BEEN RECEIVED, PURCHASER RESERVES THE RIGHT TO WITHHOLD PAYMENT UNTIL STATEMENT HAS BEEN RECEIVED AND CHECKED, AND DOES NOT WAIVE THE RIGHT TO DEDUCT CASH DISCOUNT
IN THE EVENT THAT MERCHANDISE HAS NOT BEEN RECEIVED, PURCHASER RESERVES THE RIGHT TO WITHHOLD PAYMENT UNTIL MERCHANDISE HAS BEEN RECEIVED AND CHECKED, AND DOES NOT WAIVE THE RIGHT TO DEDUCT CASH DISCOUNT
WE RESERVE THE RIGHT TO CANCEL ANY ORDER OR PORTION THEREOF, THAT IS NOT SHIPPED WITHIN THE SPECIFIED TIME (30 DAYS UNLESS OTHERWISE SPECIFIED ABOVE.) NO CHARGE WILL BE ALLOWED FOR PACKING OR CRATING UNLESS AGREED UPON BEFORE- HAND IN WRITING.

MITCHELL CONSTRUCTION CO.

AUTHORIZED SIGNATURE

RECEIVED

5. The Purchase Order (document 1) and Vendor's Acknowledgment of Purchase Order (document 2) are part of a duplex form in which the recipient signs and returns the second, acknowledgment page. The acknowledgment shown (document 2) is the second page of a reissued purchase order, not the order shown above. At trial, Mitchell explained that Interform inserted a 25% deposit requirement when it returned its acknowledgment (see notation on document 1); allegedly, to confirm that such deposit was not part of the agreement, Mitchell issued another purchase order which Interform acknowledged by returning document 2.

Document 2. Vendor's Acknowledgment of Purchase Order.

VEN 'R'S ACKNOWLEDGEMENT OF PURCHAS 'RDER Admitted 20

Defend...

**MARK THIS ORDER**
No. 995 JOB # 298

ON ALL PACKAGES, BILLS OF LADING AND INVOICES. INCLUDE PACKING SLIP WITH EACH SHIPMENT.

( 2nd time issued)

## Mitchell Construction Co.

601 INDUSTRIAL LANE - PHONE 232-8519
P. O. BOX 510 · POCATELLO, IDAHO 83201

September 8, 1971

SHIP TO State of Idaho Corrections

Institution

Boise, Idaho

To
ADDRESS

INTERFORM

1038 Princeton Drive

Venice, california

SHIP F. O. B. JOB SITE ☒YES ☐NO

VIA our truck.

Terms- net 10 %

| QUANTITY | PART NUMBER AND DESCRIPTION | UNIT PRICE | PRICE |
|---|---|---|---|
| | FURNISH FORM PANS ACCORDING TO PLANS & SPECIFICATIONS & ALL | | |
| | APPLICABLE ADDENDA: | | |
| 496 ea. | 3'-2" x 3'-2" x 1'-3" | | |
| 272 ea. | 3'-2" x 2'-11" x 1'-3" | | |
| 32 ea. | 2'-11" x 2'-11" x 1'-3" | | |
| | Legs to be 6" wide, allow ¼" strong between flanges for ¼" Tee | | |
| | mold, as discussed. Delivery F.O.B. Jobsite, 45 days or less | | $32,000.00 |
| | From Approval of Shop D. **No additional costs will be authorized** | | |
| | **without a purchase order issued by** | | |
| | **Mitchell Construction Co.** | | |
| | (NOTE: If Mitchell Construction Company does the hauling, which | | |
| | is their option, there will be an allowance of $.43 per loaded | | |
| | mile). | | |

Date of Delivery: on or before 45 days or less Liquidated damages will be charged against the supplier at the rate of _____ per day for each and every calendar day the supplier shall be in default after the date specified above.

THIS COPY TO BE SIGNED AND RETURNED IMMEDIATELY.

CONDITIONS
ALL COLLECT FREIGHT INVOICES RECEIVED BY THE PURCHASER ON FREIGHT ALLOWED PURCHASE ORDERS WILL BE BACK CHARGED WITH OVERHEAD AND PROFIT ADDED TO THE FREIGHT INVOICE COST.
IN EVENT THAT A STATLMENT HAS NOT BEEN RECEIVED, PURCHASER RESERVES THE RIGHT TO WITHHOLD PAYMENT UNTIL STATEMENT HAS BEEN RECEIVED AND CHECKED, AND DOES NOT WAIVE THE RIGHT TO DEDUCT CASH DISCOUNT.
IN THE EVENT THAT MERCHANDISE HAS NOT BEEN RECEIVED. PURCHASER RESERVES THE RIGHT TO WITHHOLD PAYMENT UNTIL MERCHANDISE HAS BEEN RECEIVED AND CHECKED, AND DOES NOT WAIVE THE RIGHT TO DEDUCT CASH DISCOUNT.
WE RESERVE THE RIGHT TO CANCEL ANY ORDER OR PORTION THEREOF, THAT IS NOT SHIPPED WITHIN THE SPECIFIED TIME (30 DAYS UNLESS OTHERWISE SPECIFIED ABOVE.) NO CHARGE WILL BE ALLOWED FOR PACKING OR CRATING UNLESS AGREED UPON BEFORE-HAND IN WRITING.

NAME OF COMPANY

AUTHORIZED SIGNATURE

2

Another document sent by Interform to Mitchell (exhibit 21, page 2) and dated September 28 also contains a 25% balance requirement as well as repeating the terms of document 1. It is unclear whether Mitchell issued the second purchase order in response to its receipt of the second sheet of document 1 or of exhibit 21, but this in no way affects the status of document 2 as Interform's acceptance.

Document 3. "Speed Memo."

TO _James F. Miller_
_Interform 10-8 Princeton Dr._
_P.O. Box 630 Venice, Calif. 16291_

FROM **RECEIVED** SEP-1 7. 1971
**Mit ell Construction Co.**
GENERAL CONTRACTORS **Admitted**
601 Industrial Lane - P. O. Box 510
POCATELLO, IDAHO 83201
Plaintiff's Exhibit No. **4**

SUBJECT: _Fiberglass Pans (Boise Prison)_ DATE: _7-14-71_

FOLD

_Jim, Have you ordered Pans?_
_What is the delivery date?_
_Are you sending shop drawings?_
_Are you sending Freight rate allowance?_
_When we get this information we will send_
_P.O. for proper amount. We wish to check the_
_freight first._

PLEASE REPLY TO 🖙 SIGNED _R. Christman_

S/ Did Don send (F16)
The Day . . .

DATE SIGNED

SEND WHITE AND PINK COPIES WITH CARBONS INTACT. WHITE COPY IS RETURNED WITH REPLY.

GEO. PRINTS & SONS, INC., POCATELLO, IDAHO

## Document 4. One of Three Bills of Lading.

| UNIFORM STRAIGHT BILL OF LADING | Original—Not Negotiable |
|---|---|

MID WI COAST COOP P) ntiff's Exhibit No. 9

Shipper's No.
Company Agent's No.
Admit

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading,

at **Venice, Calif.** **Nov. 12,** 19 **71** from **INTERFORM**

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked consigned and destined as indicated below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own road or its own water line, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained including the conditions on back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

(Mail or street address of consignee—For purposes of notification only.)

Consigned to **MITCHELL CONSTRUCTION CO.,**
**State of Idaho Correotions Institution**

Destination **Boise, Idaho.** _____ State of **Idaho** County of _____

Route _____

Delivering Carrier _____ Car Initial _____ Car No. _____

| No Packages | Description of Articles, Special Marks, and Exceptions | *Weight (Sub to Car) | Class or Rate | Check Column | |
|---|---|---|---|---|---|
| | FRP - DOMES - RENTAL | | | | Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement |
| 22 Pallets | 8 35 x 35 x 15 23.8 190.4 | | 'l | | The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges. |
| | 90 35 x 38 x 15 25.2 2268 0 | | | | |
| | 232 38 x 38 x 15 26.6 6171.2 | | | | (Signature of Consignor) |
| | 8.629.2 | | | | If charges are to be prepaid, write or stamp here, "To be prepaid".- |
| | 3000 Air Caps | | | | |
| | 1 stripping gun | | | | "PREPAID" |
| | 1 repair kit | | | | |

Received $ _____ to apply in prepayment of the charges on the property described hereon

Agent or Cashier

Per _____ (the signature here acknowledges only the amount prepaid)

Charges Advanced.

* If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is "carrier's or shipper's weight."
NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding _____ per _____

† The fibre boxes used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Uniform Freight Classification."
‡ Shipper's imprint in lieu of stamp, not a part of bill of lading approved by the Interstate Commerce Commission

TRL LIC. OREGON T- 64-538
TRK OREGON. 293 311 PETERBLT

**INTERFORM** Shipper, Per MD Agent, Per _____ 1
Permanent post-office address of shipper, 1038 Princeton, Drive, XXXX, Venice, Calif.

**Rediform** (This Bill of Lading is to be signed by the shipper and agent of the carrier issuing same)

6S 685

(6)

Document 5. One of Three Invoices.[6]

**iNTERFORM**

Plaintiff's Exhibit No. **6**

1038 PRINCETON DRIVE VENICE CALIFORNIA/(213) 390-3306
MAILING ADDRESS P O BOX 630/VENICE, CALIFORNIA 90291

Admitted

| SOLD TO | SHIP TO |
|---|---|
| MITCHELL CONSTRUCTION CO.<br>601 Industrial Lane<br>Pocatello, Idaho 83201 | State of Idaho Corrections<br>Institution<br>Boise, Idaho |

TERMS: Net 10 days D.O.I.

INVOICE NO. Corrections 7085

F.O.B. ~~LOS ANGELES, CALIF.~~ Jobsite

| ORDER DATE | P O. NO. | SALESMAN | CREDIT | HOW SHIPPED | INVOICE DATE |
|---|---|---|---|---|---|
| 9-8-71 | 995 Job#298 | HSE | | MID WEST COAST COOP | 11-12-71 |

| QUANTITY | DESCRIPTION | AMOUNT |
|---|---|---|
| | F.R.P. - Domes - Rental | |
| 8 | 2' 11" x 2' 11" x 1° 3" | |
| 90 | 2' 11" x 3" 2" x 1' 3" | |
| 232 | 3' 2" x 3' 2" x 1' 3" | |
| | 41% of Contract | $13,120.00 |
| | *Delivered 11/15* | |
| | ① | |
| | 550 | |

**TERMS AND CONDITIONS**

This order is subject to all the terms and conditions on the face and reverse side hereof and supersedes Buyer's order form, if any It shall become a contract only (A) when signed and delivered by Buyer to Seller's Agent and accepted by Seller at its home office as evidenced by the mailing or delivery of a separate written confirmation by Seller's Agent to Buyer, or (B) when Buyer has accepted delivery of all or any part of the items specified herein The contract shall be construed under the laws of the State of California, shall constitute the entire agreement between the parties, and no modification shall be binding unless in writing

ACCEPTANCE OF ORDER This order shall not be considered as executed until signed by or on behalf of Purchaser and approved by an executive officer of Seller and signed by him on Seller's behalf

· PURCHASER _____

BY_____ ACCEPTED BY_____

TITLE_____ TITLE_____

 *A Division of West Coast Industries Inc.*
1038 PRINCETON DRIVE/VENICE, CALIFORNIA/(213) 390-3306
MAILING ADDRESS P. O. BOX 630/VENICE, CALIFORNIA 90291

 ⑰

6. Two additional bills of lading and two additional invoices completed the order, covering twenty-four 35 x 35 x 15 pallets, 182 35 x 38 x 15 pallets and 264 38 x 38 x 15 pallets. Except for quantities, those documents are identical to documents 4 and 5.