710 P.2d 647

**IDAHO LUMBER, INC., a corporation,
Plaintiff-Respondent-Cross-Appellant,**

v.

**Orland C. BUCK,
Defendant-Appellant-Cross-Respondent.**

No. 14155.

Court of Appeals of Idaho.

Dec. 3, 1985.

Jack G. Voshell of Voshell & Wright, Idaho Falls, for defendant-appellant-cross-respondent.

Edward W. Pike and Franklin N. Smith of Albaugh, Smith, Pike, Smith & Anderson of Idaho Falls, for plaintiff-respondent-cross-appellant.

ON DENIAL OF PETITION FOR RE-HEARING THIS OPINION SUPER-CEDES PRIOR OPINION ISSUED MAY 30, 1984, WHICH IS WITH-DRAWN.

SWANSTROM, Judge.

Clyde Walker contracted with Idaho Lumber, Inc., to remodel a building and to construct a parking lot on property leased by Walker from Orland Buck. With a substantial sum still owing on the remodeling contract, Walker defaulted on both the contract and the lease. Idaho Lumber filed a contractor's lien and brought suit against Walker and Buck to foreclose it. Idaho Lumber also sought recovery against Buck on a theory of quasi-contract for unjust enrichment. Walker was dismissed from the action after filing for bankruptcy and obtaining a discharge of his debt to Idaho Lumber. Following trial, the district court held that Buck was unjustly enriched, to the extent of $20,025, by the labor and materials supplied by Idaho Lumber. Buck appealed. Idaho Lumber, dissatisfied with the amount of the judgment, cross-appealed. We affirm the district court's judgment in part, vacate in part and remand.

The parties raise several issues on appeal which can be summarized as three: (1) whether the contractor's lien is enforceable against Buck; (2) whether Idaho Lumber was a real party in interest as to all of its claim; and (3) whether Buck was unjustly enriched and, if so, the amount thereof.

The following are the pertinent facts. Orland Buck owned a former funeral home which he used solely as his residence. Clyde Walker approached Buck with a proposition for Buck to renovate or to join with Walker in renovating the home for use as a restaurant. After Buck decided

against participating in the venture, Walker resolved to do it on his own. Accordingly, he obtained a ten-year lease for the property from Buck. Among other things, the lease provided for a fixed rent during the first five years. The monthly rental would then be adjusted to correspond with the change in the Cost of Living Index. Walker was also given the duty to maintain the property and:

6. Lessee shall have the right at its own expense from time to time during the lease term to improve or alter the demised premises in the following manner: To improve and remodel the building on the premises so as to create a first quality restaurant and dining room, including construction and installation of kitchens, serving areas, reception areas, dining room and related fixtures; to remodel and install additional sewers and utility services necessary to the construction of a restaurant; to level and pave necessary parking areas and remove grass, shrubs and trees where necessary; to construct and install advertising signs and materials; to construct additions and buildings to the present building on the demised premises.... Lessee shall be permitted within thirty (30) days after the expiration or sooner termination of this lease to remove any fixtures or improvements made by it, which can be removed without material damage to the demised premises; provided, that it will repair any damage to the premises caused by such removal and provided that all other alterations, improvements, additions or fixtures and any such fixtures or improvements nor removed within said thirty (30) day period shall become the property of the Lessor without compensation to the Lessee and shall be surrendered with the premises....

Finally, Walker was given the option, during the first five years of the lease, to purchase the leased property plus two other lots for $160,000.

Buck introduced Walker to Arthur Johnson, the owner of Idaho Lumber. Johnson prepared an estimate of $38,043.51 for the remodeling job. It is unclear whether Buck ever saw the estimate or the plans which were drawn up, but Walker did tell Buck that he expected to spend approximately $40,000. Construction began and Walker soon began making changes in the plans. Although Buck visited the site, it was clear that Walker had complete control over the work that was done. In the end, the total cost of the remodeling came to more than $106,000. Walker paid some $66,000 of that cost before he defaulted.[1] Idaho Lumber then filed its lien against Buck's property.

In the suit to foreclose its lien, Idaho Lumber alternatively alleged the right to recover against Buck under a theory of quasi-contract for unjust enrichment. Following trial, the district court found that Idaho Lumber could not enforce its contractor's lien against Buck under the circumstances of the case. However, the district court did find that Buck had been unjustly enriched by the labor and materials supplied by Idaho Lumber. The district court therefore initially entered judgment for Idaho Lumber in the amount of $21,275 against Buck.

Buck moved for a new trial, charging that the district court improperly found he had been unjustly enriched. The district court treated it as a motion to open its judgment, take additional testimony, amend findings of fact and conclusions of law, and direct entry of a new judgment. I.R.C.P. 59(a)(7). The motion was granted. Before further testimony was taken, however, Buck moved to amend his answer and cross-claim. He expressed a desire to add a new defense, that Idaho Lumber was not the real party in interest with regard to approximately $15,000 of its claim. This motion was denied. Finally, Buck's motion for a new trial was denied, but by a stipulation and order the judgment was decreased from $21,275 to $20,025. Buck appealed from the judgment against him. Idaho Lumber cross-appealed, contending that the district court erred in finding against it

1. We have rounded some of the figures in this opinion solely for purpose of clarity.

on the lien theory and that the district court miscalculated the amount by which Buck was unjustly enriched. We will first discuss whether Idaho Lumber's contractor's lien is enforceable against the interest of the landlord Buck.

## I. CONTRACTOR'S LIEN

The district court held that, under the facts of this case, Idaho Lumber could not enforce its contractor's lien against Buck. In its cross-appeal Idaho Lumber challenges this holding, arguing that under certain circumstances, a lessor's interest in real property may be subject to a contractor's lien for improvements made by the lessee. The right to such a lien is permitted by I.C. § 45–501:

> Every person performing labor upon, or furnishing materials to be used in the construction, alteration or repair of any ... building ... has a lien upon the same for the work or labor done or professional services or materials furnished, whether done or furnished at the instance of the owner of the building ... or his agent....

Idaho Lumber contends that Walker was an agent of Buck and therefore the lien can be enforced against him. The district court, however, found that no agency relationship existed between Buck and Walker.

■■■ Ordinarily, where there is conflicting evidence on the question whether a lessee is agent of the owner, the question becomes one of fact, and not one of law. *Clark v. Gneiting*, 95 Idaho 10, 501 P.2d 278 (1972); *Adkison Corporation v. American Building Company*, 107 Idaho 406, 690 P.2d 341 (1984). Where the question depends upon the construction of an undisputed, unambiguous written lease, and its legal effect, the question becomes one of law as to whether the terms of the instrument constituted the lessee the owner's agent. 53 AM.JUR.2d, *Mechanics' Liens*

§ 132 at 654 (1970). Where, as here, the question of agency turns on the acts and conduct of the parties, as well as upon the provisions of a written lease, the issue is a mixed one of fact and of law. As to the factual questions, unless the district court's findings are clearly erroneous, we will not disturb them on appeal. I.R.C.P. 52(a). As to whether the district judge determined the correct legal effect of the written lease and whether he applied correct legal principles to the facts, as found by him, we exercise free legal review.

■■■ We commence our analysis in this case with this general principle: "[A] tenant is not the 'agent' of the landlord, for the purpose of [I.C.] § 45–501, merely by virtue of a lessor-lessee relationship." *Christensen v. Idaho Land Developers, Inc.*, 104 Idaho 458, 459, 660 P.2d 70, 71 (Ct.App.1983). *See also Bunt v. Roberts*, 76 Idaho 158, 279 P.2d 629 (1955). The burden of proving agency rests upon the party asserting it. *Transamerica Leasing Corp. v. Van's Realty Co.*, 91 Idaho 510, 427 P.2d 284 (1967).

■■■ Initially, we are required to determine what is meant by our lien statute in referring to work done or materials furnished "at the instance of the owner of the building ... or his agent." It is clear that the owner's knowledge and acquiescence in the improvements are not sufficient to justify charging his interest with a lien. "The improvement must have been 'requested' by the owner of the land." *Gem State Lumber Co. v. Union Grain & Elevator Co.*, 47 Idaho 747, 749–50, 278 P. 775, 776 (1929), citing *Parker v. Northwestern Investment Co.*, 44 Idaho 68, 75, 255 P. 307, 309 (1927).[2] *Accord Interiors Contracting Inc. v. Navalco*, 648 P.2d 1382 (Utah 1982). However, where the lease or a contract of purchase requires the lessee (or vendee) to make certain improvements, then the lessee (or vendee) is said to become the agent

---

**2.** We recognize that *Parker* dealt with a lien for improving lots under I.C. § 45–504, which uses the words "at the request of the owner," whereas the other cases we discuss in this paragraph involve § 45–501 which states "at the instance of the owner." We believe that the two phrases have the same meaning in these statutes. *Accord Stewart v. Talbott*, 58 Colo. 563, 146 P. 771 (1915).

of the owner, and in those cases the interest of the owner as well as the interest of the lessee or vendee will become subject to the lien. *See e.g. Boise Payette Lumber Co. v. Sharp,* 45 Idaho 611, 264 P. 665 (1928) (contract of sale required vendees to construct barns); *Gem State Lumber Co. v. Union Grain & Elevator Co., supra* (lease required lessee to "effect certain alterations and make repairs").

In *Christensen v. Idaho Land Developers, Inc., supra,* we held that provisions in a lease coupled with a letter, forwarded by lessor to lessee, listing certain electrical repairs that a building inspector had determined were necessary, constituted a request by lessor that the specific repairs be made.

█ An examination of the lease in the present case shows that it clearly gave Walker the *right* to make improvements, but it did not give any corresponding right to Buck to *require* any particular improvement. We believe the facts adequately demonstrate that Walker was not required by the lease to make the improvements, even though the parties contemplated they would be made. Therefore, from an examination of the lease, we cannot say as a matter of law that the work done and materials furnished were made were "at the instance of" Buck.

Idaho Lumber next points to the lease and other irrefutable evidence showing that Buck consented to the work that was done. The argument is made that consent of the lessor is sufficient basis for imposing the lien against the owner. Idaho Lumber relies upon the underlined language below from *Bunt v. Roberts,* 76 Idaho 158, 161, 279 P.2d 629, 630 (1955):

A tenant or lessee is not generally considered the agent of the lessor within the interpretation of the mechanics' lien law merely by virtue of the relationship of landlord and tenant, and a tenant or lessee cannot subject the interest of his landlord to a mechanic's lien by reason of the tenant's contract with a materialman

or laborer, <u>unless the owner</u> does some act in ratification of, or <u>consent[s] to the work done and the furnishing of the material or labor.</u> 36 AM.JUR. 73, Secs. 93 to 95; *Rio Grande Lumber & Fuel Co. v. Buergo,* 41 N.M. 624, 73 P.2d 312, 123 A.L.R. 1; *Boise-Payette Lumber Co. v. McCornick,* 36 Idaho 788, 213 P. 1119. [Emphasis added.]

The underlined phrase is drawn in part from an introductory statement of general law found in 36 AM.JUR. *Mechanics' Liens* § 93 at 73 (1941).[3] Neither of the two cases cited supports the underlined statement. Neither case recognized the existence of a lien upon the interest of the owner. *Rio Grande* clearly held that consent for certain repairs specified in the lease to be made by the lessee was *not* sufficient to extend the materialman's lien to the lessor's interest. The entire reported opinion in *Boise-Payette* is as follows:

Appellant seeks by this action to foreclose a lien on certain lots of respondent on the ground that it furnished materials to one C.M. St. Lawrence as the agent of respondent for the repair of a house standing on said lots, but there is no evidence whatever tending to establish such agency. Judgment affirmed, with costs to respondent.

36 Idaho at 789–90, 213 P. at 1119. In *Parker v. Northwestern Investment Co., supra,* our Supreme Court noted:

Numerous authorities may be found which hold that where the owner has consented to the construction of improvements the owner will be bound. It will be found, however, that such cases are based upon a statute different from ours and where *request or permission* is sufficient to give rise to a lien.

44 Idaho at 74, 255 P. at 308. The AM. JUR. sections cited in *Bunt* make it equally clear that where, as here, the statutory right to a lien rests on agency, mere consent is not sufficient to give rise to a lien against the owner's interest.

---

3. The phrase in AM.JUR. actually is "unless the owner does some act in ratification of, or con-

sents to, or is estopped to object to work done or the furnishing of materials or labor."

The Supreme Court has never had occasion to cite *Bunt* for the proposition that mere consent of the owner to the work performed or materials furnished is sufficient to impose a lien under I.C. § 45–501 against the owner's interest. In view of *Parker* and the later cases we have cited, none of which was discussed or mentioned in *Bunt,* we can only conclude that mere consent or acquiesence of the owner that the work be done is not sufficient to give rise to a lien. To the extent that our general discussion in *Christensen v. Idaho Land Developers, Inc.* 104 Idaho 458, 459, 660 P.2d 70, 71 (Ct.App.1983) is not consistent with our present holding, our present ruling is controlling.

We now believe that the more precise and controlling law in *Bunt* is contained in the following paragraph:

> The estate or property of a lessor is not subject to a mechanic's lien for improvements contracted for by his lessee unless the lessor has made him his agent or otherwise conferred the requisite authority on him, or ratified his acts, or is estopped to deny the validity of the lien. [Citations omitted.]

76 Idaho at 161, 279 P.2d at 630.

On the agency question the district court also looked to the extrinsic evidence. If implied agency exists, proof of it is more apt to be in the acts and conduct of the parties, rather than in the written lease. The district court determined that "Buck was generally aware of the character of the improvements being made to his property, but did not expressly authorize Idaho Lumber, Inc., to expand the remodeling effort beyond the original plans and estimate." The court concluded that "the requisite principal-agent relationship did not exist between Buck and Walker within the contemplation of the Idaho mechanic's lien laws." We agree.

The "authorization" given by Buck for the alterations to his property really amounted only to consent to have Walker expend approximately $40,000 in the remodeling effort. *Rio Grande Lumber & Fuel Co. v. Buergo, supra; Interiors Contracting Inc. v. Navalco, supra.* Compare *Rowen & Blair Elec. Co. v. Flushing Operating Co.,* 399 Mich. 593, 250 N.W.2d 481 (1977). Before it commenced any work on the premises Idaho Lumber was aware that Buck was the owner and that Walker was only a lessee. Idaho Lumber's owner, Mr. Johnson, testified that he was unaware of the terms of the lease until after Walker's bankruptcy occurred. It is undisputed that Johnson never looked to nor relied upon Buck for any part of the remodeling cost until after Idaho Lumber had done the work and Walker had failed to pay for it. Lack of reliance by the contractor or materialman upon the credit of the owner has been a factor considered in determining whether any agency relationship existed. *See e.g. Rowen & Blair Elec. Co. v. Flushing Operating Co., supra; Bunt v. Roberts, supra;* 53 AM.JUR.2d *Mechanics' Liens* § 132 at 655 (1970). It is true that the improvements contemplated by Buck and Walker were substantial. They altered and expanded the uses to which the property could be put. The improvements did inure to Buck's benefit, but on this point it can also be said that in undertaking these improvements Walker expected to exercise his option to purchase at a predetermined price which was consistent with the value found of the premises and lots before the remodeling. Thus, it could be said that only Walker expected to gain from the improvements. We hold the district court did not err in denying a lien against Buck's interest in the property.

## II. REAL PARTY IN INTEREST

We next reach an issue Buck has raised in his appeal. Buck claims that Idaho Lumber was not the real party in interest as to approximately $15,000 of the cost of the improvements. I.R.C.P. 17(a). This sum represents work done by three subcontractors. However, if Idaho Lumber has potential liability to these subcontractors then it would be a real party in interest as to the sum claimed. The present record does not show whether such potential liability now exists. It merely shows that the

subcontractors have not filed timely liens nor have they sued Idaho Lumber. However, these facts alone are not sufficient for us to conclude that Idaho Lumber is freed from all liability to the subcontractors. Their claims may have been preserved by means not apparent from this record. We therefore reject the argument that Idaho Lumber is not the real party in interest as to the full amount of its claim.

### III. UNJUST ENRICHMENT

Buck's principal attack is against the finding that he was unjustly enriched. While several grounds are urged, essentially he argues that the evidence was insufficient to show that he was enriched or, in the alternative, that any such enrichment was unjust. He also argues that even if he was unjustly enriched, the district court erred in computing the amount. In its cross-appeal Idaho Lumber also contends that the court erred in computing the amount of the enrichment.

 Buck first contends that because there was an express contract between Idaho Lumber and Walker, Buck cannot be held liable under a quasi-contract theory for unjust enrichment. He quotes 66 AM. JUR.2d *Restitution And Implied Contracts* § 59 (1973):

> Therefore, when services are performed under an express contract, the action to recover for such services must be under the express contract, in the absence of the fault or the consent of the defendant. Thus, where work and labor is performed under a contract, suit must be between the parties to the contract; *and third persons, although benefited by the work, cannot be sued on an implied assumpsit to pay for that benefit,* because an implied undertaking cannot arise, as against one benefited by work performed, where the work was done under a special contract with other persons. [Footnotes omitted. Emphasis added.]

That section goes on to say:

> According to the prevailing view, however, *a recovery may be had on the common counts where a special contract existed but has been waived, abandoned, ended, or performed,* or where the plaintiff has been prevented by the defendant from completing the work. It has also been ruled that a plaintiff seeking compensation for services may unite a common count in assumpsit with a count on a express contract; may declare on a special contract and on a general count for work done; may allege an express contract and quantum meruit in the alternative; or may abandon his allegations of a special contract and proceed on quantum meruit. [Footnotes omitted. Emphasis added.]

Walker's bankruptcy and the subsequent discharge of his obligation to Idaho Lumber "ended" his express contract with Idaho Lumber. 11 U.S.C. § 727(b). Therefore, the contract between Walker and Idaho Lumber presents no barrier preventing a recovery for unjust enrichment against Buck. *Backus v. Apishapa Land and Cattle Co.*, 44 Colo.App. 59, 615 P.2d 42 (Ct.App.1980).

 Nor does a recovery on a theory of quasi-contract for unjust enrichment depend upon the existence of an express contract between the plaintiff and defendant. In a quasi-contract case, the recovery is not based on a *contractual* obligation at all, but an obligation *imposed by law. Continental Forest Products, Inc. v. Chandler Supply Co.,* 95 Idaho 739, 518 P.2d 1201 (1974). The basis for recovery is that it would be unjust for one party to retain a benefit which he has received from another. *Hertz v. Fiscus*, 98 Idaho 456, 567 P.2d 1 (1977). The party receiving the benefit must make restitution to the party giving the benefit *only* to the extent that "as between the two parties [the benefit] would be unjust for one party to retain." *Continental Forest Products, Inc. v. Chandler Supply Co.,* 95 Idaho at 743, 518 P.2d at 1205.

Buck further contends that Idaho Lumber's loss resulted from its "own voluntary actions in a calculated business judgment, with its inherent risks, not induced by any

conduct of the defendant." Therefore, Buck claims Idaho Lumber is not entitled to recover in quasi-contract. We disagree. Buck cites *Brighenti v. New Britain Shirt Corp.*, 167 Conn. 403, 356 A.2d 181 (1974), for this proposition. In that case, Brighenti, believing a lease would be finally executed, performed services and purchased materials in anticipation of that event. The court held he could not recover for these services and materials because he did not rely upon representations made by the president of New Britain Shirt Co. and "others in behalf of the defendant [company]." *Id.* 356 A.2d at 182. Brighenti was thus found to be a volunteer or, in other words, an officious meddler. *See* D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 4.9 (1973). Here, all labor and materials supplied were *requested* by Walker. None were supplied after Idaho Lumber became certain that Walker would make no further payments.

Similarly, *Kody Engineering Co., Inc. v. Fox and Fox Insurance Agency, Inc.*, 158 Ind.App. 498, 303 N.E.2d 307, (Ct.App.1973), also cited by Buck, is inapplicable. *Kody* stands for the proposition that in order for one party to recover in quasi-contract, the other party must have expressly or impliedly requested the benefit. The basis of the holding in *Kody* is the same as that in *Brighenti*—a volunteer is not permitted to force another to become indebted to him. While it is true that Buck did not request the benefit himself, it is equally true that Buck not only consented in writing to the remodeling work but also knew that it would be done by Idaho Lumber. Under these circumstances, we will not apply the rule cited by Buck.

The more applicable rule is found in *Paschall's Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150, 155 (1966):

[W]here a materialman or subcontractor furnishes labor and materials which benefit the property of a person with whom there is no privity of contract, an action on quantum meruit may lie against the landowner to recover the reasonable value of said labor and materials so furnished.

We wish to make it clear that recovery on such an action may not be had in every instance where a subcontractor or materialman has furnished materials or labor which benefit a third person. Our decision in this case is limited to affirming the propriety of quasi contract as a remedy in such factual situation. Each case must be decided according to the essential elements of quasi contract, to-wit: A benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.

The most significant requirement for a recovery on quasi contract is that the enrichment to the defendant be unjust. Consequently, if the landowner has given any consideration to any person for the improvements, it would not be unjust for him to retain the benefit without paying the furnisher. Also, we think that before recovery can be had against the landowner on an unjust enrichment theory, the furnisher of the materials and labor must have exhausted his remedies against the person with whom he had contracted, and still has not received the reasonable value of his services.

We are presented with a similar fact situation in the present case.[4] Idaho Lumber furnished labor and materials, benefitting the property of Buck with whom it had no privity of contract. Idaho Lumber then brought suit against Walker, with whom it did have a contract, but was thwarted by Walker's subsequent bankruptcy. Therefore, Idaho Lumber may maintain an action

---

4. In the present case we are concerned with a claim for unjust enrichment, which is somewhat different from a claim for quantum meruit. *See Peavey v. Pellandini*, 97 Idaho 655, 551 P.2d 610 (1976). Both, however, are measures of recovery in quasi-contract and, therefore, this same rule, with its prerequisites, set forth above from *Pashall's*, applies whether a party seeks recovery for quantum meruit *or* unjust enrichment.

in quasi-contract against Buck to recover the benefit unjustly retained, so long as the essential elements of quasi-contract are present.

We must now determine whether the evidence supports the judgment against Buck for unjust enrichment. This involves determining first whether there was enrichment; second, if so, whether it was unjust for Buck to retain any of that benefit; and third, how much of that benefit it was unjust for Buck to retain.

Buck contends that the rental value of the property after Idaho Lumber completed the improvements was actually less than the rental called for by his lease with Walker. Accordingly, he argues he was not enriched by the improvements. Buck made an offer of proof showing that after the first five years of the lease Walker's rental payments would have increased from $450 to $670 per month—if the purchase option was not exercised—because of the adjustment the lease required for the consumer price index. This evidence was rejected as immaterial by the district judge.

The question is not whether the property after remodeling had a higher or lower rental value than the rental figure in the lease. The relevant question is whether the property, after remodeling, had a higher or lower rental value than the property had *before the remodeling.* Buck's proffered evidence would not have answered this question.

■ The amount of rental payments was negotiated by Buck and Walker before any remodeling was started. They may or may not have had any relationship to the fair rental value of the property after remodeling. More reliable evidence would be what the property could be rented for in its remodeled condition. Buck did submit evidence that was admitted, showing the amount of monthly rental he received from two tenants who leased the property following Walker's default. This amount was more than the $450 Walker had paid but less than the $670 he would have paid if the lease had run beyond five years. Thus, Buck was not precluded from introducing

relevant evidence as to the fair rental value of the property following the remodeling. We hold that it was not error for the trial court to reject Buck's offer of proof.

Buck also points out that Walker had an option to purchase and that Buck was locked into the option price by his lease with Walker. He argues that under the lease he might never have been enriched by the improvements made by Walker. However, the event which resulted in Buck being enriched, the failure of Walker to meet his obligations, also was the event which set Buck free from the obligation to sell his property at the option price of $160,000. Neither the contract to pay for the remodeling nor the lease exists any longer because of Walker's bankruptcy. Because the value of his property was unquestionably increased by the labor and materials supplied by Idaho Lumber, Buck was enriched at the expense of Idaho Lumber.

The next question is whether it was unjust for Buck to retain any of the enrichment.

> The phrase "unjust enrichment" is used in law to characterize the result or effect of a failure to make restitution of, or for, property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor. It is a general principle, underlying various legal doctrines and remedies, that one person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly. [Footnotes omitted.]

66 AM.JUR.2d *Restitution And Implied Contracts* § 3 (1973). The district court held that it would be unjust for Buck to retain all of the enrichment without making some restitution and we agree.

When Buck leased the property to Walker, he knew that Walker wanted to remodel it into a "first quality restaurant." The lease, while it included an option to purchase, also clearly contemplated that at some time in the future the leasehold might terminate and the property revert to Buck. Admittedly, Walker was given the right to remove certain fixtures within thirty days, but any that were not or could not be removed were to become Buck's property. Buck could, therefore, reasonably expect to realize an increase in the value of his property as a result of the improvements. As it turned out, the option to purchase was not exercised by Walker due to his financial failure and subsequent bankruptcy. Buck realized a substantial increase in the value of his property while Idaho Lumber realized a loss on its contract with Walker. We believe the circumstances are such that the district court could properly find that Buck was unjustly enriched and should make restitution.

We finally turn to the computation of the unjust enrichment.

> The measure of damages in a claim of unjust enrichment is the value of the benefit bestowed upon the defendant which, in equity, would be unjust to retain without recompense to the plaintiff. The measure of damages is not necessarily the value of the money, labor and materials provided by the plaintiff to the defendant, but the amount of benefit the defendant received which would be unjust for the defendant to retain.

*Gillette v. Storm Circle Ranch*, 101 Idaho 663, 666, 619 P.2d 1116, 1119 (1980). The trial judge calculated the amount of unjust enrichment as follows. He found that the value of the property before the improvements was $140,000; after the improvements it was $197,500. The increase in value was therefore $57,500. The total cost of the improvements to Walker was $106,000, of which $66,000, or 63%, was paid by Walker. The judge reasoned that Idaho Lumber had therefore received a proportionate amount (63%) of the value of the improvements, leaving 37% of the value unpaid. Accordingly, the district court de-cided that justly Buck should pay 37% of the *increase in value of the property*. The district court therefore awarded Idaho Lumber $21,275, the amount of the *unjust* enrichment.

We will first examine the "actual amount of enrichment" as found by the trial court. The trial court based its findings upon the testimony of Richard Clayton, Idaho Lumber's appraisal witness. Buck stipulated that Clayton was a qualified expert. Clayton first testified that before the remodeling the four lots constituting the business premises were worth $100,000 and the building was worth $40,000. Clayton then testified that, in his experience, the kind and extent of remodeling that was done to Buck's building has generally increased the value of buildings about $15 per square foot in the area in Idaho Falls where the property was located. Clayton used a figure of approximately 5,500 square feet in this case, arriving at $82,500 as the amount of increase in value to the building. To this figure he added another $15,000 for parking lot improvements, making the total increase in value to the property $97,500.

The trial judge, on the other hand, apparently construed Clayton's testimony differently for he found that the value of the building after remodeling was $15 per square foot. Thus, the judge found that "the total value of the property [excluding the land value] as improved by Idaho Lumber, Inc., amounts to $97,500.00." By the judge's calculations the total amount of the benefit bestowed on Buck was $97,500 minus $40,000, or $57,500.

At a post-trial hearing on motions to amend findings of fact and conclusions, Idaho Lumber produced a partial transcript of Clayton's trial testimony in an effort to convince the judge that he had misconstrued Clayton's testimony. The judge stated that, "as trier of the fact, like a jury, I have to rely upon the evidence as I recall it and I recall it the way it is found in the Memorandum Decision, so I think it will have to stand. That is my recollection of the evidence." However, just as a court

can permit testimony to be read back to a jury after deliberations have been commenced, so can it "replay" doubtful testimony while amendment or correction of findings and conclusions are, as they were here, properly before the court.

▋ It appears that the trial court either made a mathematical error or it misconstrued Clayton's testimony. If the evidence clearly pointed to a correct result, we could—without engaging in any fact finding—direct the correct result. Here, however, the evidence is not absolutely clear, nor is it undisputed, and there is a need to remand.

First, there was other contrary appraisal evidence introduced by Buck's appraisal expert. While the trial judge was willing to accept Clayton's testimony that the value of the building was increased by the remodeling to a total value of $97,500, we cannot say that the trial judge—if he misapprehended Clayton's testimony—would have accepted the expert's opinion that the building's value after remodeling was actually $137,500 ($40,000 plus $97,500).

In fact, there are indications in the record that the trial judge ultimately found the value of the improvements to be even less than $57,500. While the record is not clear as to the reason for this, it does show that the judge, at a post-trial hearing, amended his findings of fact and conclusions of law to reduce the "value of improvements for which plaintiff has not received payment" by $1,250. This indicates that the judge for some reason not shown reduced the "actual amount of enrichment" by $1,250.

Presumably because Clayton was an unchallenged expert, many leading questions were permitted. Unfortunately, the questions—and hence the suggested answers—contain mathematic errors or discrepancies in the number of square feet used in Clayton's calculations. Whether Clayton took into account the fact that some of the remodeling was incomplete or unusable is also in doubt. Clarification of or correction of this testimony could affect substantially the resulting estimated value of the improvements.

▋ Finally, Clayton's testimony was not entirely clear that after remodeling the property was worth a total of $237,500 *as a restaurant.* Clayton attributed the highest and best use of the property to be for office rental, to architects, engineers, lawyers and the like. He stated that the second best use was a restaurant. He admitted that additional minor remodeling would have to be done before the building would be fully suitable for office rental purposes. No cost figures were given for this additional conversion work. Before the trial court accepts Clayton's previous testimony as to value, it should be made clear whether Clayton's opinion of value was predicated upon any use other than as a restaurant. Buck can be charged only with the benefit actually bestowed, not with some potential benefit which can be fully realized only by the expenditure of additional time and money.

Once the district judge has determined the actual amount of enrichment he must then determine how much of that enrichment justly can be retained by Buck without payment for it. In his memorandum decision—if not in his formal findings of fact—the district judge noted that Buck "paid no consideration in any way" for the improvements made to his property. Walker, on the other hand paid Idaho Lumber a total of $66,000 for improvements which resulted in a maximum benefit—to Buck—of $97,500.

▋ Purely for the sake of illustration and guidance on remand, we will assume that the witness Clayton testified that the property, as actually remodeled, had an increased value of $97,500.[5] If the district

5. If the reasonable value of the materials and labor furnished by Idaho Lumber in making the improvements were less than the value of the benefit bestowed upon Buck, then, of course, the lesser figure would be the maximum amount of Idaho Lumber's recovery from Buck. This is so because once Idaho Lumber has been paid—from any source—for the value of the labor and materials furnished, it would not be *unjust* for Buck to retain the full value of the

judge fully accepts such testimony and if the district judge determines that it would be unjust for Buck to retain any part of this benefit without paying for it, then the amount to be paid by Buck to Idaho Lumber would be calculated as follows:

| | |
|---|---|
| Value of benefit retained by Buck ... | $97,500 |
| Amount Idaho Lumber has already been paid by Walker for this benefit . | $66,000 |
| Maximum amount which Idaho Lumber can recover from Buck if the evidence now before the trial court is viewed most favorably to the respondent, Idaho Lumber ......... | $31,500. |

At most, only $31,500 of the benefit can be said to be unjustly retained by Buck, even though Walker left $40,000 of his debt to Idaho Lumber unpaid. In other words, it is only just that Buck be given full credit against the amount of benefit received for all payments Walker made for the improvements. When Idaho Lumber has received a total of $97,500 it will have been paid fully for the actual amount of the enrichment. If Buck were required to pay any more than $31,500 then Idaho Lumber would be receiving more for the benefit than its value. While the present record indicates this figure of $31,500 is the *maximum* recovery which Idaho Lumber can have against Buck on an unjust enrichment theory, we do not suggest that it is the correct amount. For one thing, we have no way of telling from the present record how the $1,250 reduction made by the trial judge in the "value of improvements for which plaintiff has not received payment" would affect the maximum possible recovery. Within the limits we have stated it is within the sound discretion of the trial court to determine the amount of the "unjust" enrichment. We remand to the district court for a redetermination of the "actual amount of enrichment" as well as the amount thereof which would be unjust for Buck to retain without payment for it.

benefit bestowed upon him. Here, however, the trial court found that the reasonable value of the materials and labor was $106,000. Buck has not disputed this finding on appeal, and the court's finding is supported by substantial evidence in the record. Therefore, our attention in this appeal is only upon the determination of

On these issues either party should be permitted to submit additional evidence if desired.

The case is remanded for further proceedings consistent with this opinion. Each party having prevailed in part on this appeal, we award no costs or attorney fees.

WALTERS, C.J., concurs.

BURNETT, Judge, dissenting.

The majority opinion reflects an investment of much time and effort. Nevertheless, I am constrained to disagree with it. The majority, declining to follow recent Idaho decisions, ascribes a narrow meaning to the Idaho lien statute and shuts the door against the contractor's lien asserted in this case. Ironically, the majority then opens a back door to recovery by stretching the doctrine of unjust enrichment beyond the limits established by sound legal authority. I respectfully dissent.

### I

It is important to remember what is really at stake here. A landlord and a tenant executed a lease providing for an old funeral home to be remodeled into a restaurant. Based upon an estimate by the contractor, the landlord and tenant contemplated an expenditure of about $40,000. The tenant and contractor, without full knowledge or any participation by the landlord, later incurred cost overruns inflating the total bill to $106,000. The tenant paid $66,000 of this sum before receiving a discharge in bankruptcy. The contractor now seeks to collect the remainder from the landlord. He asserts a lien against the property and, in the alternative, he seeks restitution for the landlord's allegedly unjust enrichment.

This dual theory of recovery embodies an assumption—implicitly adopted by the ma-

the amount of benefit bestowed, called the "actual amount of enrichment" in *Continental Forest Products, Inc., v. Chandler Supply Company*, 95 Idaho 739, 743, 518 P.2d 1201, 1205 (1974), and upon the determination of the "unjust" component of the enrichment.

jority today—that if recovery on a lien is unavailable, then the claimant may resort to some other "equitable" remedy. The assumption fails to recognize that the lien law itself is a codified creature of equity. It provides an exception to the common law rule that if one improves land under contract with a third party other than the landowner, he may recover only from the third party. The equitable footings of the lien law have been noted in one of the earliest texts on the subject:

> The general principle upon which all mechanic's-lien laws are based is, that they are remedial in their nature, intended to aid contractors, material-men, mechanics, and laborers to secure the just or contract price for materials furnished, money expended, labor furnished or done upon property, on the theory that the material used in or labor expended upon the specific property has enhanced its value, and that *it is equitable that the material-man should follow his material into the building of which it has become a component part, or that the laborer should pursue the result of his toil, in order to secure his just compensation;* and because the building is the result of such labor done and material furnished, that *it is not just that the owner should succeed to that labor and material without compensating the persons furnishing such labor or material.* [Emphasis added.]

S. BLOOM, A TREATISE ON THE LAW OF MECHANICS' LIENS AND BUILDING CONTRACTS 7–9 (1910) (footnotes deleted).

Because lien laws are grounded in equity, we should treat with caution any suggestion that unjust enrichment will occur when an applicable lien law does not provide compensation. Such a suggestion may reflect an overly restrictive interpretation of the lien law, or an overly expansive view of unjust enrichment, or both. In the present case, as I explain below, the majority opinion demonstrates both.

## II

The majority creates a rigid dichotomy between landlords who request improvements to be constructed on their properties and landlords who merely have knowledge of, or acquiesce in, such improvements. The majority recognizes no other category. Consequently, the majority finds it difficult to categorize this case. Here, the landlord did not directly request the contractor to construct improvements on his property. Neither did he merely know of, or acquiesce in, the improvements. Rather, he affirmatively consented to the improvements and authorized their construction by signing a lease that provided for the tenant to create a "first quality restaurant." The majority, imprisoned by its own dichotomy, analogizes this case to one where the landlord merely knows of, or acquiesces in, the improvements. The majority then holds that Idaho's lien law does not apply to such a case but that the landlord must pay restitution for unjust enrichment.

## A

I will turn in a moment to the question whether the majority properly has categorized this case. But even if the categorization were correct, the majority's conclusion regarding unjust enrichment would not follow. It is well settled in equity that a landowner who incidentally benefits from improvements constructed, or ordered to be constructed, by a third party is not required to pay restitution.[6] The governing principle is set forth in the RESTATEMENT OF RESTITUTION § 110 (1937):

> A person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other merely

6. An incidental benefit conferred in a three-party arrangement must be distinguished from a direct benefit conferred in a two-party relationship between landlord and tenant. In the latter situation, a landlord may be required to pay restitution for improvements made by the tenant himself, with the landlord's knowledge and acquiescence. *E.g., Hertz v. Fiscus,* 98 Idaho 456, 567 P.2d 1 (1977); *Haskin v. Glass,* 102 Idaho 785, 640 P.2d 1186 (Ct.App.1982).

because of the failure of performance by the third person.

A distinguished author on restitution has amplified this principle:

> Where a plaintiff in the performance of his own duty incidentally confers a benefit on the defendant, it is usually held that restitution is not available. Thus, where one in possession of land hires the plaintiff to put an improvement on it, the fact that this inures to the benefit of the owner does not create liability to make restitution.

Wade, *Restitution for Benefits Conferred without Request*, 19 VAND.L.REV. 1183, 1204 (1966) (footnote deleted).

In some jurisdictions, a carefully limited exception to this general principle has evolved. Restitution may be allowed when the interests of the landowner and of the occupant "are closely intermingled and the benefits of the transactions are by prearrangement to be shared between them." *Puttkammer v. Minth*, 83 Wis.2d 686, 266 N.W.2d 361 (1978). The *Puttkammer* court cited cases where the landowner and the occupant were mother and son, jointly engaged in developing a subdivision; where the landowner and occupant were husband and wife, each having a joint interest in the property; and where the landowner and occupant were lessor and lessee, the lessor having approved all plans for the improvements and having made all payments directly to the contractor from his own bank account. Absent such a special relationship, the *Puttkammer* court held that no restitution was due to "one who did the work, and produced an incidental gain to the owner, by merely performing his contract with another and [who] is now dissatisfied because the return promised

under the contract is not forthcoming." 266 N.W.2d at 365.

The majority today, ruling that there should be restitution for unjust enrichment in this case, relies heavily upon *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150 (1966). However, a careful reading of that decision discloses that it invoked the same narrow exception discussed in *Puttkammer*. In *Paschall's* a contractor furnished materials and labor for construction of a bathroom addition to the landowner's house. The work was requested by the owner's son and daughter, who shared the premises with the owner. In allowing restitution to the contractor, the *Paschall's* court cited cases from other jurisdictions involving similar special relationships between landlords and occupants—e.g., husband and wife, parent and child, or siblings. 407 S.W.2d at 155. The *Paschall's* court recognized that in the absence of exceptional circumstances, no restitution would be required.[7]

The instant case involves no such special relationship. The landlord and the tenant were unrelated to each other. They did not prearrange to share the benefits of the contractor's work. Rather, the tenant was given a purchase option by which he could retain all of the improvements. If the option were not exercised, the improvements would devolve to the landlord. Finally, the tenant made all payments to the contractor; no funds or bank accounts of the landlord were utilized. Consequently, it is clear that the present case, even if it truly were one in which the landlord had knowledge of, and acquiesced in, the improvements, would present no occasion to compel restitution by the landlord. By ordering such restitution, while at the same time likening this case to one in which the landlord mere-

7. Some portions of the *Paschall's* opinion, including passages quoted by the majority, reflect confusion between restitution for unjust enrichment and compensation based upon quantum meruit. The *Paschall's* court said, "Actions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same." 407 S.W.2d at 154. However, our Supreme Court has recognized the difference between unjust enrichment and quantum meruit. *See Peavey v. Pellandini*, 97 Idaho 655, 551 P.2d 610 (1976). The *Paschall's* decision twice has been cited by our Supreme Court—both times with apparent disapproval. *See Dale's Service Co. v. Jones*, 96 Idaho 662, 666 n. 9, 534 P.2d 1102, 1106 n. 9 (1975), *questioned on other grounds, Peavey v. Pellandini, supra; Smith v. Sherwood & Roberts, Spokane, Inc.*, 92 Idaho 248, 255 n. 25, 441 P.2d 158, 165 n. 25 (1968).

752

ly knew of, or acquiesced in, the improvements to his property, the majority ushers in a brave new world of restitution—a world where rules governing landlord liability are swallowed up by a broadened concept of unjust enrichment.[8]

B

I suggest a different analysis. This case need not, and should not, be analogized to one in which the landlord merely has knowledge of, or acquiesces in, the improvements to his property. As noted earlier, the landlord here affirmatively consented to such improvements by executing a lease that expressly authorized them. In my view, this crucial fact invokes application of the Idaho lien law. In *Bunt v. Roberts*, 76 Idaho 158, 161, 279 P.2d 629, 630 (1955), our Supreme Court said:

A tenant or lessee is not generally considered the agent of the lessor within the interpretation of the mechanics' lien law merely by virtue of the relationship of landlord and tenant, and a tenant or lessee cannot subject the interest of his landlord to a mechanic's lien by reason of the tenant's contract with a materialman or laborer, unless the owner does some act in ratification of, or consent to the work done and the furnishing of the material or labor.

The majority today launches a curious attack upon *Bunt*. The majority notes that other references to "consent" cannot be found in the handful of prior Idaho cases construing the lien statute, I.C. § 45–501. But is this a sufficient reason to condemn *Bunt?* I think not. Language carefully chosen by our Supreme Court should not

be disregarded merely because it goes beyond that found in earlier cases. Rather, the question is whether such language can be integrated into a coherent statement of the law. We recently provided such a statement in *Christensen v. Idaho Land Developers, Inc.*, 104 Idaho 458, 459, 660 P.2d 70, 71 (Ct.App.1983):

As a general principle, a tenant is not the "agent" of the landlord, for the purpose of § 45–501, merely by virtue of a lessor-lessee relationship. *See generally* Anno., 74 A.L.R.3d 330, 334–43 (1976). However, this principle has two closely related corollaries in Idaho. First, a landlord's interest in real property may be subjected to a lien, for work performed by agreement with the tenant, if the lease specifically requires the tenant to see that the work is done. *E.g., Gem State Lumber Co. v. Union Grain & Elevator Co.*, 47 Idaho 747, 278 P. 775 (1929). Second, the landlord's interest may be subjected to a lien if he requests the work to be done. *Parker v. Northwestern Investment Co.*, 44 Idaho 68, 255 P. 307 (1927). The latter corollary applies to any case where the landlord has done "some act in ratification of, or consent to[,] the work done and the furnishing of material and labor." *Bunt v. Roberts*, 76 Idaho 158, 161, 279 P.2d 629, 630 (1955).

The majority challenges this formulation by noting that I.C. § 45–501 establishes a lien "for the work or labor done ... or materials furnished, whether done or furnished at the *instance* of the owner of the building ... or his agent." (Emphasis sup-

8. By allowing recovery for unjust enrichment, when such recovery would not otherwise be available under Idaho's lien law, the majority also invites two collateral consequences. First, it subjects the landlord to liability upon a judgment *in personam* rather than upon the judgment *in rem* that would be entered upon a lien. A judgment of restitution is a personal charge to be paid entirely by the judgment debtor. However, a judgment on a contractor's lien is a charge only against the subject property, to the extent of its value. *Pierson v. Sewell*, 97 Idaho 38, 539 P.2d 590 (1975). Second, the amount of restitution for unjust enrichment may be either

less than or greater than the actual cost or reasonable value of the labor and materials provided. The majority opinion, at its note 5, *supra*, states that the reasonable value of the labor and materials represents a ceiling upon restitution. However, no authority is cited for that proposition. The doctrine of unjust enrichment is intended to compel a defendant to disgorge benefits that it would be inequitable for him to retain. The amount of such benefits may or may not, upon a given set of facts, be equal to or less than the labor and services provided. *See generally* D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES §§ 4.1 and 4.5 (1973).

plied.) Citing a Colorado case decided four decades before *Bunt*, the majority states that the word "instance" means "request". The majority concludes that "mere consent or acquiescence of the owner that the work be done is not sufficient to give rise to a lien."

However, nowhere does *Bunt* speak of "mere consent" or suggest that "consent" is something passive, akin to acquiescence. Rather, as interpreted in *Christensen*, *Bunt* refers to ratification or consent in an active sense. It envisions "some act" of the landowner.[9] *Bunt* comports with common sense by saying that if the landowner, by his own act, consents to or ratifies the construction of improvements on his property, then the labor or materials may be deemed to have been furnished at his "instance".[10]

I submit that *Bunt* is sound when applied to this case. Indeed, the parties themselves contemplated the possibility that a lien would be filed on the property. In the paragraph of the lease where the creation of a "first quality restaurant" is mentioned, the next sentence (deleted from the majority's quotation of this paragraph) goes on to say:

> The Lessee shall indemnify the Lessor against any mechanic's or materialman's or other lien arising out of the making of any alteration, repair, addition, or improvement by the Lessee, and shall hold the Lessor harmless of any such liens or claims, including reasonable attorney's fees and costs that may be incurred in removing any such liens.

It is undisputed that the underlying purpose of the lease was to provide a means for the tenant to take possession of the premises and to create a restaurant. The tenant was not interested in the property for any other purpose. Thus, although the lease did not command the improvements to be made, the creation of a restaurant was for all practical purposes the heart of the lease.

The Utah Supreme Court recently encountered a similar situation in *Interiors Contracting Inc. v. Navalco*, 648 P.2d 1382 (Utah 1982). The lien law of that state, like I.C. § 45–501, provides for imposition of a lien for labor and materials furnished at the "instance" of the owner or his agent. In *Navalco* an owner of commercial property leased it to a party who subleased it. The original lease did not contemplate any specific improvements to the property. However, the sublease allegedly provided for the tenant to remodel the premises as a restaurant. A contractor furnished labor and materials for the project, but was not fully paid. The contractor filed a lien against the reversionary interests of the sublessor and the landowner. The Utah Supreme Court dealt separately with each of these interests. The Court observed that the landowner was a "remote lessor" and that its lease with the sublessor "did not contemplate that the premises were to be used as a restaurant." 648 P.2d at 1390. The Court further said—as noted by the majority in today's opinion—that the landowner merely knew of, and acquiesced in, the remodeling project. Accordingly,

9. In its quotation from *Bunt*, the majority changes the word "consent" to "consent[s]". This change is convenient to the majority's apparent view that the words "some act" refer only to ratification and not to consent, thus inferentially reducing consent to a passive phenomenon. Concededly, the change brings the quoted language into closer conformity with a passage from *American Jurisprudence*. But it alters the syntax of the quoted sentence and creates grammarical problems. I think our reading of *Bunt* in *Christensen* is less strained and more faithful to the language actually chosen by the Supreme Court.

10. The majority does not reject *Bunt* in its entirety. The following excerpt is quoted by the majority with approval:

> The estate or property of a lessor is not subject to a mechanic's lien for improvements contracted for by his lessee unless the lessor has made him his agent *or otherwise conferred the requisite authority on him*, or ratified his acts, or is estopped to deny the validity of the lien. [Citations omitted.]

76 Idaho at 161, 279 P.2d at 630 (emphasis added). Even if *Bunt* were limited to this language, I would submit that the landlord "conferred the requisite authority" upon the tenant in the present case.

the court held that the landowner's reversionary interest was not subject to a lien.

However, in another section of the opinion, not mentioned by the majority today, the Utah Supreme Court dealt differently with the reversionary leasehold interest of the sublessor. The Court, overturning a summary judgment for the sublessor, held that if the facts ultimately showed that the property had been subleased in contemplation of creating a restaurant, and such improvements had been authorized in the sublease itself, then the sublessor impliedly may have made the tenant his agent, "at least to some extent, within the contemplation of the mechanics' lien statute." 648 P.2d at 1387. The Court, quoting from *Utley v. Wear*, 333 S.W.2d 787, 793 (Mo.Ct. App.1960), said:

> In determining whether an agency should be implied the courts have often, perhaps of necessity, gone beyond the agreement and into the whole circumstances of the letting in order to find the answer. * * * [W]here the premises are let for a *specific purpose* and where the nature of the premises is such that the purpose *cannot be accomplished* except by the making of substantial improvements to the freehold, then the tenant is, by implication, *required* to make such improvements. He has no other option, and hence he is the landlord's (implied) agent to the extent of subjecting the property to a lien, this upon the theory that the landlord contemplated the necessity and required that such necessity be met.

*Navalco*, 648 P.2d at 1387 (emphasis original).

In *Anderson v. Sokolik*, 88 So.2d 511 (Fla.1956), the Florida Supreme Court announced a similar ruling. Applying a statute providing for liens upon improvements made "in accordance with" a contract between the landlord and tenant, the Florida Court held that a lien would be imposed upon improvements authorized, albeit not required, by a lease if the improvements were the "pith of the lease." 88 So.2d at 514–15.

Of course, *Bunt* speaks of "consent" while *Navalco* and *Anderson* speak of "implied agency." But the result is the same. When a landlord leases his property to a tenant in contemplation that certain improvements will be made, and those improvements explicitly are authorized (although not mandated) by the lease, then the lessor's reversionary interest is subject to a lien for the labor and materials furnished. By ruling otherwise, the majority today unduly narrows the scope of Idaho's lien law and sets the stage for its overly broad treatment of restitution as a standby remedy.

C

Because I would hold the landlord's reversionary interest subject to a lien, I am obliged to define the scope of the lien. When a lien is imposed upon a theory of "consent," the lien embraces expenditures within the ambit of the landlord's consent. Thus, in *Hankinson v. Vantine*, 152 N.Y. 20, 46 N.E. 292 (1897), the New York Court of Appeals, construing a statute that provided for a lien when the landlord "requests or consents to" the improvements, has held that a landlord could not be deemed to have consented to improvements beyond the scope of the authorized project and beyond the landlord's knowledge. By a parity of reasoning, the Michigan Supreme Court has held that when a lien is imposed upon a theory of implied agency, the scope of the lien is subject to limits upon the tenant's authority, as delineated in the lease. *Rowen & Blair Electric Co. v. Flushing Operating Corp.*, 399 Mich. 593, 250 N.W.2d 481 (1977).

Here, the landlord consented to, or impliedly made the tenant his agent for, the construction of a "first quality restaurant." No dollar figure is set forth in the lease. However, as noted earlier, the landlord and tenant mutually envisioned an expenditure of approximately $40,000. The cost overruns, raising the ultimate figure to $106,-000, evidently occurred for two reasons. First, the tenant and the contractor later

discovered that the project as originally envisioned would require modifications to comply with municipal code requirements. Second, the tenant, on his own initiative, made various changes in the project without consulting the landlord. In my view, the landlord's consent, or the tenant's implied agency, would include those modifications needed to complete the project in conformity with the municipal codes. However, neither the consent nor the implied agency could be said to embrace changes later made by the tenant on his own initiative.

The district judge made no finding—indeed, under his view of the case he had no occasion to determine—the relative proportions of the cost overruns attributable to code requirements and to the tenant's modifications. The record reveals no obvious answer to this question. Accordingly, it is an appropriate subject for remand to the district court. *Pope v. Intermountain Gas Co.*, 103 Idaho 217, 646 P.2d 988 (1982). I would direct the district court to impose a lien upon the property for the amount (if any) by which the reasonable value of labor and materials for the original project and for code-required modifications exceeds the sum of $66,000 already received by the contractor. The remainder, consisting of labor and materials requested by the tenant without knowledge or participation of the landlord, would be excluded from the lien.

This result, I submit, not only would represent a proper application of the Idaho lien law but also would alleviate the problems associated with any separate equitable recovery. No equitable principle requires the landlord to pay for the portion of the cost overruns upon which the tenant and the contractor independently agreed without the landlord's full knowledge or his participation. Most importantly, this result would avoid the improper narrowing of the lien law, and the undue broadening of the doctrine of unjust enrichment, found in the majority opinion today.